**SCHOOL CITY OF GARY, an Indiana Municipal Corporation, Petitioner,**

v.

**L. G. DERTHICK, Commissioner of Education, Department of Health, Education and Welfare, Respondent.**

**No. 12678.**

United States Court of Appeals
Seventh Circuit.

Dec. 31, 1959.

Albert H. Gavit, Gary, Ind., for petitioner.

Joseph H. Meyers, Harry J. Chernock, Alan S. Rosenthal, Washington, D. C., Mark R. Joelson, George Cochran Doub, Asst. Atty. Gen., Parke M. Banta, Gen. Counsel, Dept. of Health, Education, and Welfare, Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, and KNOCH and CASTLE, Circuit Judges.

HASTINGS, Chief Judge.

School City of Gary, Indiana, petitioner herein, filed an application for a direct grant from the federal government under Public Law 815, 81st Cong. as amended, 20 U.S.C.A. ch. 14.[1] This application was denied by L. G. Derthick, Commissioner of Education, Department of Health, Education and Welfare, respondent (Commissioner). Appeal from that decision is taken to this court pursuant to Public Law 815, 20 U.S.C.A. § 277(b).* It appears that this is a case of first impression before a Court of Appeals reviewing the Commissioner's refusal to grant benefits under the statute before us.

Public Law 815 was passed in 1950 to provide direct federal financial assistance to school districts whose resources had been severely restricted or whose facilities had become greatly overcrowded because of activities of the Government. Congress enacted this law to fulfill a

---

[1]. The law applicable to this case is Public Law 815 as last amended on September 2, 1957 by Public Law 85–267 and prior to its further amendment on August 12, 1958 by Public Law 85–620. Accordingly, the 1952 edition (Supp. V) rather than the 1958 edition of the U.S.Code is cited. The latter amendment extended the life of the law and made certain other minor changes not relevant to the issue before us. The statute, as most recently amended, appears in 20 U.S.C.A. §§ 631–645 (1958 ed. Supp.).

* Now § 641(b).

federal "obligation" to these impacted areas.[2]

This obligation had arisen in two ways. First, in acquiring and maintaining large areas of land for defense purposes, the land having been freed from local property taxes, the federal government had substantially lessened the tax base upon which local communities relied to finance their school facilities. The problem was compounded because frequently such federal establishments were staffed with military personnel whose children attended local schools. Second, post-war defense contracts had served as incentives for many people to move to defense production areas, thereby substantially increasing the number of children to be educated in local facilities.

Public Law 815 fulfilled this federal obligation by providing direct aid to assist in the construction of school facilities required by the increased number of federally-connected pupils. In the administration of this program, Congress based eligibility for assistance on the increase in the number of students measured from a base year. Congress classified these students in three categories: children whose parents live *and* work on federal property (Class A); children whose parents live *or* work on federal property (Class B); and children whose parents neither live nor work on federal property, but whose federal connection arises from other federal activities such as the performance of government contracts by private employers of the parents (Class C). The case before us concerns an application based solely on an increase recognized by Class C.

Federal assistance under Public Law 815 was not designed to compensate *fully* for the costs of increased construction, but rather the Government agreed to provide a percentage of the average per-pupil cost of constructing minimum school facilities. The statutory percentage for the Class C classification was 45% of such cost.

If an applicant was eligible under the first two classifications, aid was available without reference to the effect of the federal activity on local financial resources. However, in Class C, since the local economy might have been greatly stimulated by increased defense production, federal aid was available only when the construction of additional educational facilities would impose an "undue financial burden on the taxing and borrowing authority" of the applicant school district. Public Law 815, § 305(c). 20 U.S.C.A. § 295 (c) **.

The determination whether an undue financial burden exists was left to the discretion of the Commissioner of Education. In judging the impact of addi-

---

2. The Congressional history of Public Law 815 can be summarized as follows: In the first session of the 81st Congress, S. 2317 was introduced by Senator Humphrey on July 22, 1949 to provide both long range and emergency assistance to states and local school districts for school construction. S. 2317 was one of forty bills introduced at that session to provide federal school aid. It was passed after the long range provisions had been stricken from the bill. In the closing days of the 1st session, the House refused to act summarily on S. 2317. The bill at this point made aid "proportionate to Federal responsibility, as determined by the Commissioner" in cooperation with local officials. It made no attempt to set classes for eligibility, and financial burden was not expressly a part of eligibility. See Cong.Record, 81st Cong., 1st Sess.,

9970, 11885, 12378, 14727 et seq., 14951, 14962.

In the second session of the 81st Congress, the House, after exhaustive hearings, broadly amended S. 2317 into the present form of Public Law 815. The House substitute refined the test for federal assistance, defined eligibility classes, and established the financial burden test for areas "where there is a very large and sudden increase in school population in a district not associated directly with loss of tax revenue, but which is too great for the community to absorb with its own resources." The Conference Committee's report, in substance the House substitute, was accepted by both Houses. See Cong.Record, 81st Cong., 2nd Sess., 11927, 13039, 13042 et seq., 13056, 13181, 14272, 14943, and House Report 2810.

** Now § 635(c).

tional school construction on local taxing and borrowing authority, the Commissioner has considered both federally-connected and non-federally-connected pupils who are without adequate facilities and for whom the applicant has a concurrent need for constructing minimum school facilities.

The School City of Gary (applicant), on November 14, 1957, made application for a direct grant of $2,350,000 under Public Law 815, basing its application upon its increased pupils in Class C. It was stipulated that the applicant requires additional minimum school facilities for 3,751 federally-connected pupils (at a construction cost of $3,751,000) and for 8,621 non-federally-connected children (at a cost of $8,621,000). The total cost of providing adequate facilities for these ill-housed school children is $12,372,000.

These statistics confirm a pressing need for additional facilities. To meet this need, applicant has utilized the resources at hand to a large degree. It was stipulated that the over-all 1957 tax rate per hundred dollars, for Gary, Indiana, is $9.86, of which the school tax rate is $5.39, both rates higher than those of any of the other five largest cities in Indiana. Gary has levied a Cumulative Building Fund Tax at the rate of $1.25 per hundred dollars, the statutory maximum (Burns' Ind.Stat.Ann. § 28–1110 (1958 Repl., Supp.) ), which yields $3,000,000 per year. It has virtually utilized all legal bonded indebtedness. Applicant's debt limit under the Indiana Constitution at the time of application was $4,706,521, of which all but $31,521 was exhausted. Further, applicant requested aid from the Indiana Veterans Memorial Loan Fund, but such aid was not available. All these facts indicate that applicant has made strenuous efforts to cope with the problem of providing increased school facilities.

However, on April 24, 1958, the office of the Commissioner made a preliminary denial of applicant's request for funds, stating that the required additional construction would not impose an undue financial burden on applicant. This denial was based largely on the failure of applicant to utilize "Holding Corporations" pursuant to the Indiana School House Holding Corporation Act, Burns' Ind.Stat.Ann. § 28–3201 et seq. (1948 Repl., Supp.), to provide additional school construction. Applicant admits that it has not attempted to utilize the benefits of this Act.[3]

On June 20, 1958, applicant requested a formal hearing which was held before a hearing examiner on October 23 and 24, 1958. On March 24, 1959, the hearing examiner filed his Initial Decision denying applicant's request for funds. On May 7, 1959, the Commissioner denied further review of the Initial Decision. This appeal followed.

The main point in controversy throughout this proceeding is the applicability of the foregoing Indiana School House Holding Corporation Act (Schoolhouse Act). The Schoolhouse Act provides a method whereby a school district may *lease* facilities. Since Public Law 815 provides for construction of facilities, applicant contends that, as a matter of statutory interpretation, consideration of the Schoolhouse Act is irrelevant. Continuing, he argues that since the hearing examiner found that requiring *applicant* to build additional schools would constitute an undue financial burden, the Commissioner is compelled to grant its request for funds. But even if the Schoolhouse Act is relevant, applicant contends that it was an abuse of

---

3. This Act, in effect, provides for the organization of a holding corporation under the laws of Indiana for the purpose of acquiring a site, erecting thereon school facilities, *leasing the same to a school corporation* (school city), collecting rentals therefor and applying the proceeds to payment of interest or dividends on its outstanding securities or loans (the issuance of which is authorized), the redemption and cancellation thereof, and the payment of incidental corporate expenses. Otherwise, the corporation shall act entirely without profit. Burns' Ind. Stat.Ann. § 28–3220 (1948 Repl., Supp.).

discretion to conclude that it was applicable in this case.

Applicant takes sharp issue with most of the Initial Decision which may briefly be summarized. The decision denying the application found that any increase in applicant's taxes to finance construction would be an undue financial burden. But it held that an alternative means of providing the facilities through the construction and leasing of such facilities to applicant by a holding corporation could be accomplished with no increase in taxes.

Further, the decision held that lease rentals were not "debt" which would force Gary beyond the maximum fixed by the Constitution of Indiana, but were current expenses; that such rental payments could properly be made from the revenue currently raised by the Cumulative Building Fund Tax; that this, at least partially, would compel Gary to abandon its "pay-as-you-go" plan for future school construction, but that going into debt to provide these facilities was not, *per se*, an undue burden.

This case is before us pursuant to the provisions for review in Public Law 815 which incorporate the familiar standards of the Administrative Procedure Act. See 5 U.S.C.A. § 1009(c). Findings of fact unsupported by substantial evidence may be set aside, and questions of law may be fully reviewed.

■ We disagree with applicant's contention that, as a matter of statutory construction, the Commissioner is precluded from considering the relevancy of the Indiana Schoolhouse Act. Admittedly a literal reading of § 305(c), Public Law 815 (the eligibility requirements of aid), gives some weight to applicant's interpretation. It states that an applicant "shall not be eligible [for aid]. * * unless * * * the *construction* of additional minimum school facilities * * will * * * impose an undue financial burden on the taxing and borrowing authority of such agency." (Emphasis added.) There is indeed no express mention whether *leasing* facilities would impose such financial burden.

An examination of the Congressional history of the act reveals a definite Congressional concern that educational facilities were greatly overcrowded and that local governmental taxing units were losing substantial revenue. The thrust of the debate clearly indicates an intent to fulfill a federal obligation where the Government had, by its actions, created local problems. The purpose of the act was to insure adequate facilities. The history of the act does not reveal that it was Congressional intent that the necessary construction *had to be initiated by the applicant*.

The House Report of the bill as substantially passed indicates that the Commissioner, "[i]n determining whether the construction of additional school facilities in the circumstances will impose an 'undue financial burden' on the taxing and borrowing authority of the local educational agency, [can take into] account any State aid or other financial aid available to the locality from other sources." House Report 2810, 81st Cong., 2d Sess., pp. 11–12.

We hold that, as a matter of law, in the exercise of his discretion under § 305(c), Public Law 815, the Commissioner may consider methods of providing facilities for a local school agency other than through construction by such agency. It was not legal error, *per se*, for the Commissioner to consider the Indiana Schoolhouse Act in the exercise of his discretion.

■ Applicant further contends that if the Schoolhouse Act is relevant, it cannot be applied in the instant case and that it was error to hold otherwise. In this connection, applicant charges the Commissioner with an abuse of discretion in that: (a) the Commissioner should not consider methods of construction which could not legally be initiated by the school district; (b) Indiana law precludes the use of the Schoolhouse Act because rental payments thereunder would be within the limitation of constitutional debt; (c) use of the Schoolhouse Act would force applicant to abandon its less costly "pay-as-you-go" plan

for future construction; (d) it was unreasonable to conclude that the bond issue of $12,372,000 necessary to finance construction under the Schoolhouse Act was marketable; and (e) the action of the Commissioner was arbitrary.

Section 305(c) expressly places the administrative responsibility for determining the existence of an undue financial burden "in the judgment of the Commissioner." 20 U.S.C.A. § 295(c). The House Committee Report relevant to this section states that:

"The question of what is an 'undue' financial burden * * * is not one which can be settled satisfactorily in legislation by a hard and fast formula but is necessarily something which has to be left to the sound judgment of the Commissioner." House Report 2810, 81st Cong., 2d Sess., p. 11.

We hold that under the facts of this case, it was not an abuse of discretion for the Commissioner to consider a process whereby school facilities can be provided in the manner authorized by the Indiana Schoolhouse Act. Applicant contends that the power to organize the requisite holding corporation under Indiana law does not rest in a school district but in private citizens. It argues that to consider means which the school district has no power to initiate could force the district to make an endless search for funds which might possibly be available from the state, private foundations or other outside sources.

The case before us, however, does not present an endless search, but rather the failure to take the first, obvious step. Although it is true that the Schoolhouse Act requires the formation of an independent, non-profit corporation under the laws of Indiana, this does not so hinder its use to make it an improper criterion in the exercise of the Commissioner's discretion. The record shows that at least 143 school districts in Indiana have utilized this corporate vehicle. To that list can be added a schoolhouse holding corporation in South Bend, Indiana, which between 1956 and 1958 sold a bond

issue of $4,400,000 for such corporate purposes.

The primary purpose of the Indiana Schoolhouse Act is to provide relief in circumstances where the Indiana constitutional debt limitation precludes further bonding by the municipality. Many communities have taken advantage of it. The vigorous prosecution of the instant application and the statements of community support made before the hearing examiner do not indicate that the use of such a holding corporation would be impractical in Gary, Indiana.

We find no error in the conclusion that the Indiana constitutional debt limitation is not a potential restriction on the use of the Schoolhouse Act. Applicant has contended that it is *legally* precluded from using the Schoolhouse Act because annual rental payments to the holding corporation, added to its existing debt, would exceed its constitutional debt limitation.

An Indiana Constitutional Amendment of 1881 limits the legal indebtedness of any political or municipal corporation to 2% of the value of the taxable property within such corporation. Ind.Const. Art. 13, § 1. Gary's potential indebtedness was $4,076,521, of which all but $31,521 was exhausted. It was stipulated that a total annual rent burden of $719,618 would accrue to the applicant if a holding corporation were formed to construct the needed $12,372,000 school facilities and lease such facilities to applicant. It was further agreed that the revenue from the Cumulative Building Fund Tax ($3,000,000 per year) could be applied to this expense if it was not pledged elsewhere. This annual charge of $719,618 includes retirement of principal, interest rates of 4% per annum, and nominal organizational and operating expenses of the holding corporation. Clearly, if this $719,618 is constitutional "debt," then utilization of the Schoolhouse Act would be unconstitutional and to predicate a denial of benefits under Public Law 815 on its use would be an abuse of discretion.

However, the Indiana cases interpreting the constitutional section in question hold that charges such as rental payments are not constitutional debt but are merely current expenses when current revenue is sufficient to defray them.[4]

■ There was no abuse of discretion in requiring applicant, in effect, to alter its present method of financing future construction. To sustain the result, supra, that utilization of the Schoolhouse Act was legal, current revenue must support the rental payments as they come due. The Commissioner's plan to provide this revenue (without increasing taxes, which he found would create an undue financial burden) was to divert part of the current receipts of the Cumulative Building Fund to meet these rental expenses. The applicant objected to this on two grounds: some of the current receipts were already pledged to contracts for additional buildings, and the Commissioner's plan would force the applicant to give up its attempted "pay-as-you-go" plan for future school construction which might result in sharply increased costs.

The first objection presents no great problem. The Commissioner found that the unpledged surplus from the Cumulative Building Fund in 1958 and 1959 would be sufficient to defray for almost three years the annual rental costs of $719,618. For the more distant future, where receipts of the funds are unpledged, it was stated that "there appears to be no reason for believing that the applicant's ability to meet its annual rental payments after 1959 would meet with any real difficulties." We agree.

As to the second objection, we do not find it to be an abuse of discretion for the Commissioner, in effect, to predicate the refusal of benefits under Public Law 815 on the applicant's unwillingness to abandon its "pay-as-you-go" plan for construction, even in part. As the hearing examiner stated:

"There can be no denying that buying for cash is cheaper than buying on time. This is not the same, however, as saying that buying on time constitutes an undue burden. Many communities are presently using the schoolhouse building corporation financing method. To ask that the applicant do so as well does not impose an undue burden."

■ We find no abuse of discretion, considering the record as a whole, in the Commissioner's findings that were the applicant to utilize the Schoolhouse Act, the bonds issued thereunder would be marketable. Speculation on this point would prove unnecessary if such an attempt were made.

We find no arbitrary action on the part of the Commissioner in denying applicant's request (because of failure to utilize the Schoolhouse Act) while granting benefits to others who similarly had failed to utilize the act. We have carefully considered the instances cited for comparison by applicant. The action taken by the Commissioner in these cases, in our opinion, when considered in the light of their factual background, was reasonable and does not support the charge that the Commissioner was arbitrary in the instant case.

4. Indiana cases bearing on this question are City of Valparaiso v. Gardner, 1884, 97 Ind. 1; City of South Bend v. Reynolds, 1904, 155 Ind. 70, 57 N.E. 706, 49 L.R.A. 795; Voss v. Waterloo Water Co., 1904, 163 Ind. 69, 71 N.E. 208, 66 L.R.A. 95; Hively v. School City of Nappanee, 1929, 202 Ind. 28, 169 N.E. 51, 171 N.E. 381, 71 A.L.R. 1311; Bryant v. School Town of Oakland City, 1930, 202 Ind. 254, 171 N.E. 378, 173 N.E. 268; Jefferson School Tp. v. Jefferson Tp. School Bldg. Co., 1937, 212 Ind. 542, 10 N.E. 2d 608; Protsman v. Jefferson-Craig Consol. School Corp., 1953, 231 Ind. 527, 109 N.E.2d 889; Book v. Indianapolis-Marion Bldg. Auth., 1955, 234 Ind. 250, 126 N.E.2d 5; Becker v. Albion-Jefferson School Corp., 1956, 235 Ind. 204, 132 N.E.2d 269; and Kees v. Smith, 1956, 235 Ind. 687, 137 N.E.2d 541. This is in accord with an opinion of Ross, McCord, Ice and Miller, eminent Indiana bond counsel, introduced in evidence (over applicant's objection) before the hearing examiner.

Applicant makes other contentions that use of the Schoolhouse Act is not practical. We have examined each of these contentions and find that the Commissioner's rulings thereon were not an abuse of discretion.

Undoubtedly applicant's school facilities are greatly overcrowded and the education of the children of that city suffers because of these conditions. Nevertheless, it is not our function to *administer* Public Law 815. We may only *review* the actions of the Commissioner of Education, to whom Congress has entrusted the responsibilities of carrying out the purposes of this act.

In this case, we hold that the Commissioner neither misconstrued the meaning of Public Law 815 nor did he misapply the discretion granted to him in administering it. The decision of the Commissioner is

Affirmed.