**UNITED STATES of America**

v.

**COUNTY SCHOOL BOARD OF PRINCE GEORGE COUNTY, VIRGINIA, James O. Morehead, Division Superintendent of Schools of Prince George County, E. J. Oglesby, Edward T. Justice and Alfred L. Wingo, Members of the Pupil Placement Board, and the Commonwealth of Virginia.**

**Civ. A. No. 3536.**

United States District Court
E. D. Virginia,
Richmond Division.

June 24, 1963.

St. John Barrett, John Ossea, Jr., Washington, D. C., Attys., Dept. of Justice, C. V. Spratley, Jr., U. S. Atty. (Harold H. Greene and Alan G. Marer, Attys., Dept. of Justice, on briefs), for United States.

John S. Battle, Jr., Richmond, Va., F. L. Wyche, Commonwealth Atty. for Prince George County, for County School Bd. of Prince George County and James O. Morehead.

A. B. Scott, Richmond, Va., for Pupil Placement Bd., E. J. Oglesby, Edward T. Justice and Alfred L. Wingo.

Robert Y. Button, Atty. Gen. of Virginia, R. D. McIlwaine, III, Asst. Atty. Gen. of Virginia, for Commonwealth of Virginia.

BUTZNER, District Judge.

The United States seeks an injunction requiring the defendants to admit Negro children who are dependents of military and civilian personnel stationed or employed at Fort Lee, Virginia to schools attended only by white pupils.

The United States bases its claim upon two grounds; first, that pursuant to P.L. 815, Chapter 19 of Title 20 U.S.C. (20 U.S.C. § 631 et seq.), the Prince George County School Board gave assurance that its school facilities will be available to the federally-connected children on the same terms in accordance with the laws of the State as they are available to local children. The plaintiff urges that this is a contractual obligation or a statutory obligation.

The second ground is that the defendants have unlawfully burdened the United States in the exercise of its war powers under the Constitution.

The principal defense raised by motions and answers is that the United States does not have standing to assert the claim set forth in the complaint. The defendants also allege that the attorneys of record for the plaintiff have no authority to prosecute the suit and that the complaint does not state a claim upon which relief can be granted. They deny that the assurance given by the County School Board constitutes either a contractual or statutory obligation and they further

deny that they are burdening the plaintiff in the exercise of its war power.

The Commonwealth of Virginia also asserts that it is not a necessary or proper party.

There is little material conflict in the evidence. The Court finds the following facts.

Fort Lee is situated in Prince George County, Virginia. It is the home of the United States Army Quartermaster School and the United States Army Logistical Management Center. Also stationed at the Fort are various other army units.

Approximately 5,000 military personnel are stationed at the Fort, of whom 694 are Negroes. The Army employs about 2,000 civilians there, of whom 350 are Negroes. The school-age dependents of military personnel include 159 Negroes. The school-age dependents of civilian personnel include 426 Negroes.

The Government maintains 1,484 family housing units on the Fort. More than 600 Negroes live on the post, and of these, 57 have families living with them.

None of the facilities and activities on the post is segregated on the basis of race or color.

No educational facilities are maintained on the post for the education of the dependents of the service men except a nursery for pre-school children. Children living on the post obtain their education in public and private schools in the Fort Lee area.

The County School Board of Prince George County administers 11 public schools. The following schools are attended solely by white children: William A. Walton Elementary, Carson Elementary, Disputanta Elementary, Burrowsville Elementary, and Prince George Junior-Senior High School.

The following are attended solely by Negro children: Burrowsville Graded Elementary, Providence Elementary, Bessie H. Mason Elementary, Old Academy Elementary, Harrison Grove Elementary, and J. E. J. Moore Junior-Senior High School.

The Pupil Placement Board is an agency of the Commonwealth of Virginia. Pursuant to Section 22-232.1, Code of Virginia, 1950, as amended, it is vested with the power of placing pupils in public schools.

The School Board of Prince George County accepts applications for placement in the public schools in the County on a standard form issued by the Pupil Placement Board. The applications are transmitted by the School Board to the Pupil Placement Board for assignment of the child to a particular school.

The School Board recommends to the Pupil Placement Board the assignment. The School Board has not heretofore recommended the placement of any Negro children in a school attended by white children nor has it recommended the placement of a white child in a school attended by Negroes. It is the practice of the Pupil Placement Board routinely to approve the recommendations of the School Board as to placement of the children in particular schools, unless the parent or guardian of a child has requested a school assignment different from that recommended by the School Board. The Pupil Placement Board has never acted contrary to a placement recommendation by the School Board.

The Pupil Placement Board ordinarily does not consider a request for placement or transfer to a specific school in September other than a school in the usual attendance area of a child, unless the request is filed no later than May 31.

For the past several years the County School Board has had an informal agreement with the School Board of the City of Petersburg, Virginia, to provide for the education of the children of Negro military personnel residing at Fort Lee in the Petersburg schools. A directive issued by the headquarters of Fort Lee on July 23, 1962, advised Negro parents of this. The arrangement was suspended by the Superintendent of Schools of Petersburg on or about September 15, 1962, because of the crowded conditions of the Petersburg schools. There are no present plans to reinstate the agreement. However, during the 1962-1963 school

term Negro children from Fort Lee attended school in Petersburg.

In August 1962 eight Negro members of the Armed Forces residing at Fort Lee, applied at white schools in Prince George County for the enrollment of their children. Shortly thereafter, the Division Superintendent of Prince George Schools, wrote the parents that they should request application for placement of the pupils by the Pupil Placement Board through the City School Board of Petersburg.

In September the County School Board transmitted to the Pupil Placement Board the pupil placement applications made by the Negroes mentioned above. The County School Board recommended that the children be placed in schools of the City of Petersburg. The Pupil Placement Board did not consider the applications upon their merits, but routinely approved the School Board's recommendation on the ground that each of the requests for placement had been filed after May 31, 1962. In its letter advising the parents of this action the Pupil Placement Board stated that the placement was made without prejudice to the parents' right to make application for the school year 1963–1964, prior to June 1, 1963.

The Pupil Placement Board had previously, upon the basis of prior pupil placement applications filed by the same parents with the Superintendent of Schools of the City of Petersburg, placed seven of the Negro children in Petersburg schools. At the time the Pupil Placement Board denied the second applications, seven of the children were in attendance in schools in Petersburg. The eighth child was attending a parochial school.

Several other Negro members of the Armed Forces arrived at Fort Lee after the school term opened in September. Their children were not sent to Petersburg because by that time Petersburg had terminated its arrangement for educating the children of Fort Lee Negro personnel. These children were tentatively placed by the County School Board in Negro schools in the County. Under the prevailing practice, the Pupil Placement Board made routine formal assignment of the children in the same schools.

None of the children, or their parents, exhausted the administrative remedies of the Pupil Placement Board.

Since the opening of the school term in the Fall of 1962, the School Board has accepted 338 children for enrollment in the public schools in the County. Of these, 63 have been enrolled and placed in William A. Walton Elementary School.

The School Board of Prince George County has applied for and received from the United States under P.L. 815, Chapter 19 of Title 20, U.S.C. (20 U.S.C. § 631 et seq.), the following grants for the construction of schools in Prince George County on account of the federally-connected children attending the Prince George County schools:

| Date of Approval | School | Amount |
|---|---|---|
| 6/20/51 | Prince George Junior-Senior High | $364,008.00 |
| 11/ 8/55 | Same (addition) | 159,695.00 |
| 3/22/56 | J. E. J. Moore Junior-Senior High | 87,685.00 |
| 8/24/59 | Wm. A. Walton Elementary | 600,400.00 |
| 1/23/62 | New Elementary School | 94,500.00 |
| 6/27/62 | New Elementary School | 99,663.50 |

Pursuant to 20 U.S.C. § 636(b) (1) (F), the County School Board, when applying for each of the foregoing grants, gave assurance that its " * * * school facilities * * * will be available to the children for whose education contri-

butions are provided in Title 2 of Public Law 815 on the same terms, in accordance with the laws of the State in which Applicant is situated, as they are available to other children in Applicant's school district".

In 1950 at the time of the enactment of Chapter 19 of Title 20, U.S.C. (20 U.S.C. § 631 et seq.), the law of the State of Virginia required the segregation of students according to race in public schools. At the time of the institution of this suit, the law of the State of Virginia did not include race as a criterion for the assignment of students in public schools.

During the period from 1951 to the present time the School Board of Prince George County has applied for and received $1,150,596.58 from the United States under the provisions of P.L. 874, Chapter 13 of Title 20, U.S.C. (20 U.S.C. § 236 et seq.)

At all times pertinent to this litigation the Secretary of Health, Education and Welfare knew that the School Board of Prince George County was operating separate schools for white and Negro children.

On March 30, 1962, the Secretary of Health, Education and Welfare ruled that racially segregated education of children residing on federal property is not "a suitable" education within the meaning of 20 U.S.C. §§ 241 and 640.

The policy of the Department of Defense is to bar racial discrimination on bases and to encourage its elimination with respect to military personnel and their dependents off base.

Some of the military personnel assigned to Fort Lee sought transfers to other posts because of the racially segregated schools in Prince George County. One Army officer considered resigning his commission in the Fall of 1963 as an alternative to sending his children to segregated schools. Some of the children disliked attending the segregated schools. While the morale of some Negro officers and soldiers has been adversely affected by the segregated schools, personnel reports do not reflect a decrease in their efficiency.

The Department of Defense, to utilize its manpower, denies Negro servicemen transfers that are requested upon the sole ground of racial discrimination in nearby communities.

The purpose of P.L. 815, Chapter 19 of Title 20, U.S.C., is stated in 20 U.S.C. § 631, as follows:

"The purpose of this chapter is to provide assistance for the construction of urgently needed minimum school facilities in school districts which have had substantial increases in school membership as a result of new or increased Federal activities. * * * "

Chief Judge Hastings, in School City of Gary v. Derthick, 273 F.2d 319, 321 (7th Cir. 1959) has explained the background and legislative history of the act.

The statute sets forth in detail the basis upon which local school boards receive federal funds for school construction. Each application by a school board must contain a description of the proposed construction and site. It must also contain or be supported by a number of specifications and assurances. Among these are that the board has the right to build schools on the site and to operate them for twenty years; that the board has authority to undertake the construction and to finance its share of the cost; that the board will build the school facility within a reasonable time; that minimum wage scales will be observed; that the school facilities of the board will be available to the federally-connected children on the same terms in accordance with the laws of the state as they are available to other children; and that the board will submit reports on the project to the Commissioner of Education.

After the Commissioner of Education has reviewed the application and determined that the requirements of the statute have been met, that the project is not inconsistent with other state plans for school construction and that there are sufficient federal funds available, he

"shall approve" the application. No application may be disapproved until the Commissioner of Education has afforded the School Board a hearing. The statute also provides for judicial review of the refusal of the Commissioner to approve an application.

After approving the application, the Commissioner of Education is directed to pay the School Board ten per cent of the federal share of the costs of the project. Thereafter, as the construction progresses, the Commissioner is authorized to pay in installments the remainder of the federal share.

 It has long been recognized that federal grants authorized by Congress create binding contracts. In Burke v. Southern Pacific Railroad, 234 U.S. 669, 679, 34 S.Ct. 907, 911, 58 L.Ed. 1527 (1914), Mr. Justice Van Devanter, with reference to a federal grant of land to a railroad, made pursuant to an act of Congress, said:

"We first notice a contention advanced on the part of the mineral claimants, to the effect that the grant to the railroad company was merely a gift from the United States, and should be construed and applied accordingly. The granting act not only does not support the contention but refutes it. The act did not follow the building of the road but preceded it. Instead of giving a gratuitous reward for something already done, the act made a proposal to the company to the effect that if the latter would locate, construct and put into operation a designated line of railroad, patents would be issued to the company confirming in it the right and title to the public lands falling within the descriptive terms of the grant. The purpose was to bring about the construction of the road, with the resulting advantages to the Government and the public, and to that end provision was made for compensating the company, if it should do the work, by patenting to it the lands indicated. The company was at lib-

erty to accept or reject the proposal. It accepted in the mode contemplated by the act, and thereby the parties were brought into such contractual relations that the terms of the proposal became obligatory on both. * * * And when, by constructing the road and putting it in operation, the company performed its part of the contract, it became entitled to performance by the Government. In other words, it earned the right to the lands described. Of course, any ambiguity or uncertainty in the terms employed should be resolved in favor of the Government, but the grant should not be treated as a mere gift."

The same principle is expressed in United States v. Northern Pacific Ry. Co., 256 U.S. 51, 63, 41 S.Ct. 439, 441, 65 L.Ed. 825 (1921):

"The purpose of the granting act and resolution was to bring about the construction and operation of a line of railroad extending from Lake Superior to Puget Sound and Portland through what then consisted of great stretches of homeless prairies, trackless forests and unexplored mountains, and thus to facilitate the development of that region, promote commerce, and establish a convenient highway for the transportation of mails, troops, munitions and public stores to and from the Pacific coast, with all the resultant advantages to the Government and the public. To that end the act and resolution embodied a proposal to the company to the effect that if it would undertake and perform that vast work it should receive in return the lands comprehended in the grant. The company accepted the proposal and at enormous cost constructed the road and put the same in operation; and the road was accepted by the President. Thus the proposal was converted into a contract, as to which the company by performing its part became entitled to performance by the Government. * * * "

■ There is no essential difference between the grants to the railroads and the grants to the School Board. The Court concludes that the arrangement by which the School Board obtained money from the United States for assistance in construction of schools constituted a contract. The United States agreed to make certain payments to the School Board in exchange for certain assurances. The School Board, in order to receive the funds, gave the assurances required by the statute. The United States made the payments, and the contract is executed on its part.

■ The next issue is the meaning of the assurance, which is one of the terms of the contract. The defendants urge that the assurance is not applicable to racial segregation. The plaintiff insists that it is.

The assurance originates in 20 U.S.C. § 636(b) (1) (F):

"Each application by a local educational agency shall set forth the project for the construction of school facilities for such agency with respect to which it is filed, and shall contain or be supported by—

\* \* \* \* \* \*

"(F) assurance that the school facilities of such agency will be available to the children for whose education contributions are provided in this chapter on the same terms, in accordance with the laws of the State in which the school district of such agency is situated, as they are available to other children in such school district;"

The statute and the assurance are clear and unambiguous. Under these circumstances the law is well settled. In Carter v. Carter, 202 Va. 892, 121 S.E.2d 482, 485 (1961), the Supreme Court of Appeals of Virginia stated:

" \* \* \* The courts have neither the duty nor the power to make the contracts. It is only their function to construe them. The intention of the parties must be determined from what they actually say and not from what it may be supposed they intended to say. Where the meaning of the language used is clear, a contract needs no interpretation. It speaks for itself. We are bound to adhere to it as the authentic expression of the intention of the parties. \* \* \*"

The statute and the assurance refer to state laws without excepting any of these laws. The Court can not exclude state laws pertaining to race in the assignment of children to school. To make this exclusion, despite the clear language of the statute and assurance, would violate the well established principle expressed in Carter v. Carter, supra.

This conclusion is in harmony with the explanation of the statute given in H.R. 2810, 81st Congress, 2nd Session, page 15 (1950), U.S.Code Congressional Service, p. 3819 as follows:

"This provision is intended as a safeguard against discrimination directed against categories of children mentioned in the bill as such, but it is not intended to disturb classification on jurisdictional or similar grounds or patterns of racial segregation established in accordance with the laws of the State in which the school district is situated."

Thus, it is plain that the statute does deal with racial segregation. Pursuant to the terms of the statute, the question of racial segregation is to be determined by state law. In 1950 Congress intended that segregated facilities should be used for the education of federally-connected children in those states whose laws provided for the separation of the races. In 1951 the School Board, when it gave the assurance, intended to use segregated facilities in compliance with state laws. Both Congress and the School Board, however, clearly stated that state laws were to be the criteria by which the obligation of the assurance was to be discharged. This Court is bound to adhere to the plain language of the statute and assurance "as the authentic expression of

the intention of the parties." Carter v. Carter, supra.

Since 1950, the statute has not been changed. The intent of Congress and of the School Board has not changed. They both stated they would be guided by state law. The only thing that has changed is the state law to which the statute and the assurance refer.

■ The fact that the state law pertaining to racial segregation has changed affords no justification for disregarding the plain language of the statute or the assurance. Obviously the Congress and the School Board realized state laws would change. They can not be held to have intended that all state laws pertaining to education were frozen in the mold of 1950. The statute places no such limitation on the application of state laws.

Aside from the rules for construing contracts there is compelling authority that prohibits the Court from excluding from the terms of the assurance state laws pertaining to racial segregation.

In Oregon and Cal. R. R. v. United States, 238 U.S. 393, 422, 35 S.Ct. 908, 920, 59 L.Ed. 1360 (1915), with reference to land grants to a railroad, Mr. Justice McKenna said:

"* * * The language of the grants and of the limitations upon them is general. We cannot attach exceptions to it. The evil of an attempt is manifest. The grants must be taken as they were given. Assent to them was required and made, and we cannot import a different measure of the requirement and the assent than the language of the act expresses. It is to be remembered the acts are laws as well as grants and must be given the exactness of laws."

The Court also concludes that the School Board has breached the assurance. Under the statute and the assurance given pursuant thereto, the law of Virginia is the measure of the School Board's obligation. In argument at the bar of this Court it was not controverted that the law of Virginia excludes the race of a student as a criterion for pupil placement.

In Bradley, et al. v. School Board of the City of Richmond, et al., 317 F.2d 429, the Court said:

"Assignments on a racial basis are neither authorized nor contemplated by Virginia's Pupil Placement Act. * * * "

The evidence discloses that the County School Board and the Pupil Placement Board assigned the federally-connected children on the basis of their race.

■ The defendants point out that officials at Fort Lee and the Secretary of Health, Education and Welfare acquiesced in the manner in which Negro children from Fort Lee were assigned to schools. This, however, does not furnish a defense to this suit. In United States v. City and County of San Francisco, 310 U.S. 16, 31, 60 S.Ct. 749, 757, 84 L.Ed. 1050 (1940), the City of San Francisco urged that administrative interpretation of the Department of the Interior supported the City's claim with respect to the sale of electric power. The Court said:

"* * * We cannot accept the contention that administrative rulings—such as those here relied on —can thwart the plain purpose of a valid law. * * * "

■ Next to be considered is the position of the Pupil Placement Board of Virginia which urges that since the Negro children from Fort Lee have never complied with the administrative requirements of the Board, relief should be denied them. The difficulty with this argument is that the children were not assigned to schools pursuant to the rules and regulations of the Pupil Placement Board. Although Pupil Placement Board forms were used and the Pupil Placement Board approved the assignments made by the School Board, the Negro children were assigned upon recommendation of

the School Board to Petersburg schools through an agreement of long-standing between the County and Petersburg School Boards. With respect to the children of Negro personnel who arrived at the Fort after May 31, the School Board's recommendation of assignment to Negro schools was final because no protest was filed pursuant to administrative regulations. The Placement Board did not consider these applications on the merits. Since the opening of school in September 1962, white children were assigned to white schools without requiring them to exhaust administrative procedures.

Title 20 U.S.C. § 642(a) provides:

"In the administration of this chapter, no department, agency, officer, or employee of the United States shall exercise any direction, supervision, or control over the personnel, curriculum, or program of instruction of any school or school system of any local or State educational agency."

Since the assignment of pupils to schools deals with personnel, the Court must determine whether this section bars relief in this case. The Court concludes that it does not. The section can not be construed to annul those assurances for which Congress expressly provided in the statute. This is manifest from 20 U.S.C. § 641(a), which provides that the Commissioner of Education can withhold funds when he finds an assurance is not being carried out.

Undoubtedly no official of the federal government could exercise any supervision, direction or control over the selection of a school superintendent by the school board. No assurance was required by the Congress in this regard.

█ On the other hand, Congress did require an assurance that the school facilities be available to federally-connected children on the same terms, in accordance with the laws of the state, as they are available to other children. This can give rise to many personnel problems, but the Court does not construe the act

to mean that all such problems shall be uncorrected. For example, the purpose of the statute would be impaired and the assurance violated if the school board were to rule that local children could start to school at age 6 and federally-connected children only at age 10. This also would pertain to personnel. Certainly, however, the statute contemplates that such a situation should be corrected by federal intervention. The Court is of the opinion that 20 U.S.C. § 642(a) pertains to matters for which no provision is made in other parts of the statute. It was not intended to defeat safeguards erected by the Congress.

█ It has been suggested that relief must be initiated by administrative action because of 20 U.S.C. § 641, which provides:

"(a) Whenever the Commissioner of Education, after reasonable notice and opportunity for hearing to a local educational agency, finds (1) that there is a substantial failure to comply with the drawings and specifications for the project, (2) that any funds paid to a local educational agency under this chapter have been diverted from the purposes for which paid, or (3) that any assurance given in an application is not being or cannot be carried out, the Commissioner may forthwith notify such agency that no further payment will be made under this chapter with respect to such agency until there is no longer any failure to comply or the diversion or default has been corrected or, if compliance or correction is impossible, until such agency repays or arranges for the repayment of Federal moneys which have been diverted or improperly expended."

Subsection (b) provides for review by the Court of Appeals.

Provisions of this section are not applicable to the facts proved in this case. Here, the bulk of the funds can not be withheld because they have already been paid and the schools have been built. Ad-

ministrative action seeking repayment of federal moneys is not appropriate for several reasons. Compliance with the assurance is not impossible. The evidence does not indicate that any federal moneys have been diverted or improperly expended. Limiting relief to the repayment of federal funds would defeat the declaration of purpose of the statute set forth in 20 U.S.C. § 631.

The Court therefore concludes that relief is not limited to administrative action, and that a money judgment against the County is not authorized by the statute and would defeat the intent of Congress.

■ The Court further concludes that the United States has standing to sue to enforce the contract made by the School Board and the United States. This is a well established right of the United States. In Dugan v. United States, 16 U.S. (3 Wheat.) 172, 181, 4 L.Ed. 362 (1818), Mr. Justice Livingston said:

> "An intimation was thrown out that the United States had no right to sue in any case, without an act of congress for the purpose. On this point the court entertains no doubt. In all cases of contract with the United States, they must have a right to enforce the performance of such contract, or to recover damages for their violation, by actions in their own name, unless a different mode of suit be prescribed by law, which is not pretended to be the case here. It would be strange to deny to them a right which is secured to every citizen of the United States."

In Cotton v. United States, 52 U.S. (11 How.) 229, 231, 13 L.Ed. 675 (1850), the Court said:

> "Every sovereign State is of necessity a body politic, or artificial person, and as such capable of making contracts and holding property, both real and personal. It is true, that, in consequence of the peculiar distribution of the powers of government between the States and the United States, offenses against the latter, as a sovereign, are those only which are defined by statute, while what are called common law offences are the subjects of punishment only by the States and Territories within whose jurisdiction they are committed. But the powers of the United States as a sovereign, dealing with offenders against their laws, must not be confounded with their rights as a body politic. It would present a strange anomaly, indeed, if, having the power to make contracts and hold property as other persons, natural or artificial, they were not entitled to the same remedies for their protection. The restraints of the Constitution upon their sovereign powers cannot affect their civil rights. Although as a sovereign the United States may not be sued, yet as a corporation or body politic they may bring suits to enforce their contracts and protect their property, in the State courts, or in their own tribunals administering the same laws. * * "

Although the defendants, in their pleadings, challenged the authority of the plaintiff's attorneys to institute and maintain this action, they did not press this point in argument. Authority of the plaintiff's attorneys is found in 5 U.S.C. § 310.

■ The Court concludes that the plaintiff is entitled to relief. In order to explain the nature of this relief it is appropriate to mention several other issues.

The defendants assert that the United States does not have standing in its own name to vindicate individual, personal rights to Negro children afforded by the Fourteenth Amendment with respect to public education. This position of the defendants is well taken. The plaintiff, in its brief, has not pressed for relief upon this ground. The United States has been authorized to institute suits dealing with deprivation of voting rights, 42 U.S.C. § 1971, but the Congress has refused to authorize the United States

to institute suits to enforce the provisions of the Fourteenth Amendment with respect to the assignment of students in public schools. This Court, through Judge Oren R. Lewis, denied the United States permission to intervene in such a suit. Allen v. County School Board of Prince Edward County, 28 F.R.D. 358 (E.D.Va.1961). The opinion expressed by Judge Lewis is pertinent to this case. At 28 F.R.D. 361, he said:

"* * * to grant intervention in this case, in the absence of statutory authority, would appear to be contrary to the intent of Congress."

This Court is not disposed to depart from the sound principle expressed by Judge Lewis. See also United States v. Gulfport Municipal Separate School District, D.C., 219 F.Supp. 691, and United States v. Madison County Board of Education, D.C., 219 F.Supp. 60. Relief, therefore, is not based upon the rights of the children under the Fourteenth Amendment.

The defendants point out that Congress has not enacted legislation permitting the Secretary of Health, Education and Welfare to cut off funds to school districts that have not desegregated or planned for desegregation. Officials of the executive department have testified at hearings before congressional committees on H.R. 10056, 87th Cong., 2nd Sess. (1962), that they do not possess this power under existing law. The defendants argue, therefore, that the plaintiff here seeks to do indirectly what it can not do directly. This argument, however, does not reach the cause of action asserted here. The plaintiff in this suit does not seek to enforce the rights of all the children in Prince George County by the general desegregation of the County schools. If the plaintiff were to seek such broad relief, the argument advanced by the defendants would be pertinent. The relief in this case is limited to federally-connected children. It does not encompass all the children in the county.

Not to be confused with construction funds granted pursuant to P.L. 815, Chapter 19 of Title 20 U.S.C., are operation and maintenance funds for which provision is made in P.L. 874, Chapter 13, Title 20, U.S.C. The County has received $1,150,596.58 in operation and maintenance funds. No assurance similar to that regarding construction funds was given by the County or required by the Congress for the receipt of operation and maintenance funds. Consequently, no relief is predicated on the receipt of these funds.

█ The United States, as an alternative ground for relief, contends that the exclusion of the federally-connected Negro children from schools attended by white children is an unconstitutional burden upon the war power granted in Article 1, § 8 of the Constitution. The efficiency of Negro military personnel at Fort Lee has not been decreased. While morale of this personnel has been adversely affected by segregation of their children, the evidence does not establish that this has impinged upon the war power of the United States.

█ The intrusion of the war power upon domestic affairs is not to be lightly sanctioned. The two cases, pertaining to the war power, cited by the plaintiff, Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963) and United States v. Georgia Public Service Commission, 371 U.S. 285, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963) prohibited state regulatory action in conflict with federal procurement statutes. Congress has not, however, enacted a statute defining a uniform national policy with regard to education of defendants of military personnel. On the contrary, Congress in 20 U.S.C. § 636(b) (1) (F) recognized that state, not federal law, should be the standard governing the education of the federally-connected children. This is exactly opposite from congressional action concerning the procurement statutes. The cases on the commerce clause cited by the plaintiff are not controlling for the same reason. The fact that the School Board has deviated from state law, does not permit the application of federal military policy, as defined by the executive branch of the Government. Since the factual basis for invoking the

war power has not been established, and since Congress has defined the obligation of the School Board in terms of state law, the war power furnishes no basis for relief.

■ The Pupil Placement Board suggested in oral argument that this suit is premature because recently the Board has adopted a policy of assigning Negro applicants to schools attended by white children without regard to academic achievement or residence requirements different from those required of white children.

The chief difficulty with this position is that the County School Board has taken no action concerning this policy. Pursuant to § 22–232.30, Code of Virginia, 1950, as amended, the County can remove itself from the jurisdiction of the Pupil Placement Board. Also, the new policy of the Pupil Placement Board was not in effect at the time this suit was brought.

The relief to which the United States is entitled is measured by the statute and the assurance given by the School Board. The School Board and the Pupil Placement Board must assign the federally-connected Negro children to schools so that the school facilities of the County will be available to them on the same terms in accordance with the laws of the state as they are available to other children in the County. No more is required of these defendants. Less will not suffice.

It follows that the motions to dismiss the complaint and the School Board's motion for summary judgment must be denied.

■ The Court finally concludes that the motion to dismiss the Commonwealth of Virginia should be granted. The County School Board and the Pupil Placement Board are agents of the Commonwealth. A state acts only through its duly constituted authorities or agents. But it does not follow that a state is a necessary or proper party in litigation involving one or more of its agencies. The School Board is authorized to contract, to sue and be sued, § 22–63, Code

of Virginia, 1950. Here the United States contracted with the School Board and looked to that agency for the performance of the assurance. No law of the Commonwealth impedes the School Board in the discharge of its obligation. Relief is complete without enjoining the Commonwealth. The Court therefore concludes that the Commonwealth of Virginia is neither a necessary nor proper party.

## ORDER

All matters of law and fact having been submitted to the Court; upon consideration whereof, for reasons stated in the Memorandum of the Court this day filed; it is

## ADJUDGED and ORDERED:

1. The several motions made by the defendants that the complaint fails to state a claim upon which relief can be granted, that the plaintiff is without standing to institute this action, that the plaintiff's attorneys lack authority to represent the plaintiff in this action, are overruled.

2. The motion for summary judgment filed by the County School Board of Prince George County and James O. Morehead, Division Superintendent of Schools, is denied.

3. The motion of the Commonwealth of Virginia that it is neither a necessary nor proper party is granted and the Commonwealth of Virginia is dismissed as a defendant.

4. The defendants, and each of them, their successors, and their agents, servants and employees, are enjoined and restrained from in any manner failing to comply with the assurance given by the County School Board of Prince George County pursuant to 20 U.S.C. § 636(b) (1) (F), to the effect that the Prince George County school facilities will be available to the children for whose education contributions are provided in Title 2 of Public Law 815, on the same terms in accordance with the laws of the Commonwealth of Virginia as they are available to other children in the County.