**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**MARION COUNTY SCHOOL DISTRICT
et al., Defendants-Appellees.**

No. 78–3510.

United States Court of Appeals,
Fifth Circuit.

Sept. 10, 1980.

Rehearing and Rehearing En Banc
Denied Oct. 23, 1980.

608

Howard L. Feinstein, Joan F. Hartman, Jessica D. Silver, Attys., Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellant.

John P. McKeever, Ocala, Fla., E. Barrett Prettyman, Jr., Washington, D. C., for defendants-appellees.

Before BROWN, AINSWORTH and FRANK M. JOHNSON, Jr., Circuit Judges.

FRANK M. JOHNSON, Jr., Circuit Judge:

This is an appeal by the United States from the dismissal of its complaint against the Marion County school district and school board, the members of the school board, and the school district superintendent.

When reviewing the sufficiency of a complaint against a motion to dismiss, the allegations of the complaint are to be taken as true. No citation of authority is necessary to sustain this basic proposition. Thus, from the allegations of the government's complaint, the defendants have followed and continue to follow a policy of racial discrimination against blacks in the assignment of students in the Marion County public schools.[1] As further appears, the

---

1. According to the complaint, the present student assignment policies of the defendants with regard to certain elementary schools in the district result in racially identifiable vestiges of the district's former dual school system and perpetuate that dual school system in violation of the Fourteenth Amendment. *See generally Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *United States v. Board of Education*, 576 F.2d 37 (5th Cir.), *cert. denied*, 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978).

defendants, in exchange for the substantial amount of financial assistance the school district receives from the federal government each year, furnished assurances to the Department of Health, Education and Welfare (HEW) that in operating the school district they would comply with Title VI of the Civil Rights Act of 1964 and thus, not discriminate on the basis of race, color or national origin.[2] There is no question but that the discriminatory practices engaged in by the defendants, as the United States alleges in its complaint, constitute violations of these assurances.

The United States sought redress in the form of a court order compelling specific performance of the assurances by the defendants.[3] The district court held that the United States had no authority to maintain such a suit and for this reason dismissed the complaint.

■ We reverse. It is settled law that the United States has authority to fix the terms and conditions upon which its money allotments to state and other governmental entities should be disbursed. *Lau v. Nichols*, 414 U.S. 563, 569, 94 S.Ct. 786, 789, 39 L.Ed.2d 1 (1974); *King v. Smith*, 392 U.S. 309, 333, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968); *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 275, 295, 78 S.Ct. 1174, 1185, 2 L.Ed.2d 1313 (1958); *Oklahoma v. Civil Service Commission*, 330 U.S. 127, 143, 67 S.Ct. 544, 553, 91 L.Ed. 794 (1947). As the Supreme Court has long recognized, the United States may attach conditions to a grant of federal assistance, the recipient of the grant is obligated to perform the conditions, and the United States has an inherent right to sue for enforcement of the recipient's obligation in court. *E. g., Rex Trailer Co. v. United States*, 350 U.S. 148, 151, 76 S.Ct. 219, 221, 100 L.Ed. 149 (1956); *United States v. San Francisco*, 310 U.S. 16, 31, 60 S.Ct. 749, 757, 84 L.Ed. 1050 (1940); *Cotton v. United States*, 52 U.S. (11 How.) 229, 231, 13 L.Ed. 675 (1850); *Dugan v. United States*, 16 U.S. (3 Wheat.) 172, 181, 4 L.Ed. 362 (1818).[4] Such suits are not new to the area of 'civil rights.' *See, e. g., United*

2. Title VI provides that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

§ 601, 42 U.S.C. § 2000d. The Title further provides that:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability . . . .

§ 602, 42 U.S.C. § 2000d–1.

In 1966 and in 1970 the defendants furnished HEW with assurances of compliance. There is no copy of the 1966 assurance in the record. The 1970 assurance, a copy of which was attached to the complaint, is appended to this opinion.

3. The first paragraph of the government's complaint identifies the suit as an action not only to compel specific performance of the contractual assurances, but also to enforce Title VI and the Fourteenth Amendment. The United States' response to the defendants' motion to dismiss indicates that the Title VI and Fourteenth Amendment claims were not intended to be asserted as independent causes of action, only as subsidiary to the contract claim. As noted above, the defendants' contractual assurances were to the effect that they would comply with Title VI. Title VI's standard is that of the Constitution. *See* note 20, *infra*.

4. For example, as the Supreme Court stated in *McGee v. Mathis*, 71 U.S. (4 Wall.) 143, 18 L.Ed. 314 (1866):

It is not doubted that the grant by the United States to the State upon conditions, and the acceptance of the grant by the State, constituted a contract. All the elements of a contract met in the transaction—competent parties, proper subject-matter, sufficient consideration, and consent of minds. This contract was binding upon the State. . . .

71 U.S. (4 Wall.) at 155, 18 L.Ed. 314.

The Supreme Court's decisions established, at least by 1850, that the United States is "a legal entity capable by force of the Constitution alone, so long as it [is] acting within its constitutional powers, of claiming in its contractual and proprietary relations the same protection of general law, at least, that belonged to any other legal person." P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and The Federal System 1302 (2d ed. 1973). The case of *Cotton v. United States, supra*, decided in 1850, "merely rounded out a picture already full sketched." *Id.* The Court in *Cotton* stated:

*States v. Harrison County, Mississippi,* 399 F.2d 485 (5th Cir. 1968), *cert. denied,* 397 U.S. 918, 90 S.Ct. 925, 25 L.Ed.2d 99 (1970); *United States v. Sumter County School District,* 232 F.Supp. 945 (E.D.S.C.1964); *United States v. County School Board,* 221 F.Supp. 93 (E.D.Va.1963). *See also Halderman v. Pennhurst State School & Hospital,* 612 F.2d 84 (3d Cir. 1979) (en banc), *cert. granted limited to other issues,* —— U.S. ——, 100 S.Ct. 2984, 65 L.Ed.2d —— (1980); *United States v. Mattson,* 600 F.2d 1295 (9th Cir. 1979); *United States v. Solomon,* 563 F.2d 1121 (4th Cir. 1977); *Drennon v. Philadelphia General Hospital,* 428 F.Supp. 809 (E.D.Pa.1977).[5]

> It would present a strange anomaly, indeed, if, having the power to make contracts and hold property as other persons, natural or artificial, [public agencies] were not entitled to the same remedies for their protection. 52 U.S. (11 How.) at 231, 13 L.Ed. 675.

5. The *Harrison County* case stemmed from a federal grant to Harrison County, Mississippi, for the construction of a seawall and sand beach along the county's coastline to prevent hurricane damage. The grant was conditioned on the county's agreement that it would assure perpetual public use of the beach. When use of the beach was later discriminatorily denied to members of the public, the United States brought suit for specific performance of the agreement. This court granted the requested relief, holding that "the obligation of Harrison County as assumed in its contract with the United States is inescapable and must be enforced." 399 F.2d at 490. *See also* 414 F.2d 784 at 784–85 (5th Cir.) (on petition for rehearing and petition for rehearing en banc). The *County School Board* case involved a federal grant to the Prince George County, Virginia, school board for the construction of school facilities. In exchange for the grant, the school board furnished an assurance to the United States that the school facilities would be available to 'federally-connected' children (dependents of military and civilian personnel stationed at a local United States military base) on the same terms, in accordance with the laws of the state, as they are available to other children. Despite the fact that the relevant state statute excluded race as a criterion for student assignment, the school board assigned the federally-connected children using that criterion. The United States brought suit for an order compelling specific performance of the school board's assurance. The district court held that the United States had authority to so sue and granted the requested relief. *See* 221 F.Supp. at 103–05. *Accord United States v. Sumter County School District, supra,* 232 F.Supp. at 949–50.

The *Halderman, Mattson* and *Solomon* cases each involved suits against state officials for the relief of alleged violations of constitutional rights in the operation of state mental retardation facilities. The suits in *Mattson* and *Solomon* were filed by the United States, and the government alleged as authority for the suits only its interest in seeing to the enforcement of the laws and Constitution of the United States. *Cf.* U.S.Const. art. II, § 3 (President "shall take Care that the Laws be faithfully executed"). Although these allegations were found to be insufficient and the complaints dismissed, each court indicated that the United States might well have been entitled to seek its requested relief in a contract suit to enforce assurances the defendants had made to the United States in exchange for federal grants. *United States v. Mattson,* 600 F.2d at 1229 n.6; *United States v. Solomon,* 563 F.2d at 1125; *id.* at 1129 (Butzner, J., concurring). The *Halderman* case arose as a class action filed by a resident of a Pennsylvania state mental retardation facility. In holding that the district court acted correctly in allowing the United States to intervene as a plaintiff and seek injunctive relief, one of the issues on appeal, the court reasoned as follows:

> . . . [T]here is extensive federal legislation directed toward the well-being of the mentally retarded. . . . Large amounts of federal funds flow to Pennsylvania from the federal government, and the United States is vitally interested in the enforcement of the conditions on which those grants are made. One such condition is compliance with governing federal law. Had the United States sought to do so, it could have brought suit to enforce the conditions attached to its grants. Clearly, then, the district court did not abuse its discretion in permitting intervention under Rule 24.

612 F.2d at 92 (footnote omitted). *See also Drennon v. Philadelphia General Hospital, supra,* 428 F.Supp. at 817–18.

In opposition to this authority the defendants cite *United States v. Madison County Board of Education,* 326 F.2d 237 (5th Cir.), *cert. denied,* 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964). The citation is inapposite. Like *County School Board, supra,* and *Sumter County School District, supra, Madison* involved a number of suits filed by the United States for specific performance of certain contractual assurances made by local school boards to the United States in exchange for school construction funds. In *Madison,* the government's complaints were dismissed, not because the court found that the United States has no authority to sue to enforce contractual assurances of nondiscrimination, but rather because the court found it clear that the school boards had made no such assurances. *See* 326 F.2d at 239 ("No

The basis of the district court's decision not to recognize the United States' right to sue on its contract in this case was the court's conclusion that Congress has deliberately nullified the right where, as here, the contractual obligations the United States seeks to enforce are assurances of nondiscrimination in the operation of public schools.

■ This conclusion was mistaken. As noted, it is well established that the government's right to sue to enforce its contracts exists as a matter of federal common law, without necessity of a statute. *E. g., United States v. Tingey*, 30 U.S. (5 Pet.) 115, 127–28, 8 L.Ed. 66 (1831) (Story, J.) (calling the right "an incident to the general right of sovereignty"). *See United States v. Kearns*, 595 F.2d 729, 732 (D.C.Cir. 1978); Hart & Wechsler's *The Federal Courts and The Federal System* 1301–02 (2d ed. 1973) (citing cases). Congress may nullify the right, but, as the Supreme Court has repeatedly emphasized, courts are entitled to conclude that Congress has done so only if the evidence of Congress' intent is extremely, even unmistakably, clear. *See, e. g., United States v. United Mine Workers*, 330

U.S. 258, 272, 67 S.Ct. 677, 686, 91 L.Ed. 884 (1947) ("old and well-known rule that statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect").[6]

Contrary to the determination of the district court, and to the arguments of the defendants on appeal, there is no persuasive, much less unmistakable, evidence that Congress intended to eradicate or even restrict the United States' right to sue to enforce contractual assurances of nondiscrimination in the operation of public schools.

■ It is true, as the district court found, that the Civil Rights Act of 1964—the legislative expression on which the defendants and the district court place principal reliance—expressly establishes a number of alternative means by which the government may act to eliminate discrimination in the operation of federally-funded public schools. These include, as the district court noted, (1) informal administrative efforts to achieve voluntary compliance with Title VI's prohibition of discrimination in the operation of programs receiving federal as-

---

one would be so rash as to claim that a local school board in either of the 'hard core' States of Alabama or Mississippi would intentionally enter into a contract which it understood to provide for even partial desegregation of the races in the public schools under its jurisdiction. A more improbable official action of such a local school board can scarcely be imagined.") In contrast to the assurances in *Madison*, which provided only· that the school boards assign students in accordance with state law, the assurances here specifically provided that the defendants would not discriminate on the basis of race. *See* Appendix. The assurances here also specifically provided that "[t]he Applicant recognizes and agrees . . that the United States shall have the right to seek judicial enforcement of this assurance." *Id.*

**6.** *See also Hancock v. Train*, 426 U.S. 167, 179, 96 S.Ct. 2006, 2012, 48 L.Ed.2d 555 (1976); *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 120, 80 S.Ct. 543, 555, 4 L.Ed.2d 584 (1960); *United States v. Wittek*, 337 U.S. 346, 358–59, 69 S.Ct. 1108, 1114–15, 93 L.Ed. 1406 (1949); *United States v. Wyo-*

*ming*, 331 U.S. 440, 449, 67 S.Ct. 1319, 1324, 91 L.Ed. 1590 (1947); *United States v. Stevenson*, 215 U.S. 190, 197, 30 S.Ct. 35, 36, 54 L.Ed. 153 (1909); *United States v. Herron*, 87 U.S. (20 Wall.) 251, 263, 22 L.Ed. 275 (1874). The Court stated, for example, in *Dollar Savings Bank v. United States*, 86 U.S. (19 Wall.) 227, 22 L.Ed. 80 (1874):

. . . The prohibitions, if any, either express or implied, contained in the [Internal Revenue Law] of 1866, are for *others*, not for the Government. . . . It is a familiar principle that the king is not bound by any Act of Parliament unless he be named therein by special and particular words. The most general words that can be devised (for example, any person or persons, bodies politic or corporate) affect not him in the least, if they may tend·to restrain or diminish any of his rights and interests. . . . The rule thus settled respecting the British Crown is equally applicable to this Government, and it has been applied frequently in the different States, and practically in the Federal Courts. 86 U.S. (19 Wall.) at 239, 22 L.Ed. 80 (citations omitted).

sistance,[7] (2) formal administrative fund termination proceedings under Title VI,[8] (3) suits by the Attorney General under Title IV in response to private complaints,[9] and (4) intervention by the Attorney General under Title IX in pending private suits.[10] However, as noted above, it would be error for a court to *presume*, as apparently did the district court, that these *other means* were intended to be exclusive.[11] It would also be error for a court to conclude from a study of the Act and its legislative history that such an intent should be inferred. The Civil Rights Act nowhere states that the above-enumerated remedies are to be the exclusive means for eliminating discrimination in the operation of public schools. To the contrary, the statute clearly provides that other means of action, even if not mentioned in the Act, are to be preserved. Title VI of the Act, the particular title with which the defendants assured HEW they would comply and which assurances the United States seeks to enforce here, *see* notes 2 & 3, *supra*, states that compliance with the Title may be effected "(1) by the

termination of or refusal to grant or continue assistance . . ., or (2) by any other means authorized by law . . .." § 602, 42 U.S.C. § 2000d–1. Title XI, containing the Act's "miscellaneous provisions," states even more clearly that: "Nothing in this act shall be construed to deny, impair, or otherwise affect any right or authority of the Attorney General or of the United States or any agency or officer thereof under existing laws to institute or intervene in any action or proceeding." § 1103, 42 U.S.C. § 2000h–3. This stated intent to preserve other means of action which were not expressly set out in the Act is not contradicted by the Act's legislative history; it is corroborated. Indeed, the record of the floor debates prior to the Act's passage indicates that it was Congress' specific understanding that the "any other means authorized by law" language in Title VI quoted above included government suits to enforce contractual assurances of the kind filed by the United States here.[12] HEW issued regulations so interpreting the Act shortly after its passage. 29 Fed.Reg.

---

7. The Title's discrimination prohibition is set out in note 2, *supra*. The Title's provisions regarding administrative efforts to achieve voluntary compliance are set forth in § 602 of the Act, 42 U.S.C. § 2000d–1. *See also* 45 C.F.R. § 80.7(d).

8. § 602, 42 U.S.C. § 2000d–1. *See* 45 C.F.R. §§ 80.8(a) & (c), 80.9–80.11, 81.1 *et seq.*

9. § 407, 42 U.S.C. § 2000c–6. *See, e. g., United States v. Greenwood Municipal Separate School District*, 406 F.2d 1086 (5th Cir.), *cert. denied*, 395 U.S. 907, 89 S.Ct. 1749, 23 L.Ed.2d 220 (1969). Title IV of the Act is devoted to "Public Education."

10. § 902, 42 U.S.C. § 2000h–2. *See, e. g., Wade v. Mississippi Cooperative Extension Service*, 528 F.2d 508 (5th Cir. 1976). Title IX of the Act is devoted to "Intervention and Procedure After Removal in Civil Rights Cases."

11. For example, as the Supreme Court stated in *United States v. Stevenson*, cited above in note 6:

    The rule which excludes other remedies where a statute creates a right and provides a special remedy for its enforcement rests upon the presumed prohibition of all other remedies. If such a prohibition is intended to reach the government in the use of known rights and remedies, the language must be clear and specific to that effect.
215 U.S. at 197, 30 S.Ct. at 36.

12. Senator Pastore was one of the principal spokesmen for Title VI among the Senate sponsors of the Act. In response to an inquiry as to the meaning of the phrase "any other means authorized by law," he made clear, without contradiction, that:

    Again, if an agency's nondiscrimination requirement is embodied in a contractual commitment, the agency may be able to bring suit to enforce its contract.
110 Cong.Rec. 7060 (1964). *See also id.* at 7066 (remarks of Sen. Ribicoff) (calling such a suit "the most effective way for an agency to proceed").

    The defendants' arguments to the contrary are, at best, unconvincing. They find support for their conclusion that Congress intended to prohibit the United States from bringing suits to enforce Title VI contractual assurances (1) in the House Judiciary Committee's rejection of an original subcommittee draft of the Title that provided for enforcement through administrative fund termination proceedings, *civil actions to enforce regulations or agreements entered into under the Title*, and any other means authorized by law; (2) in the rejection by the full House of an amendment to the Title that would have eliminated all administrative means for enforcement in favor of *exclusive* reliance on contract suits, and (3) in statements by some of the Title's sponsors that one of the alternatives to administrative termination of funds was government litigation under Title IV. As for (1), the reported rewording of the Title by the

16, 301 (1964), *codified at* 45 C.F.R. § 80.-8(a).[13] For these reasons, we conclude that, contrary to the defendants' contentions, the remedies for school discrimination expressly authorized by Congress in the Civil Rights Act of 1964 were not intended to be exclusive or to restrict the United States' right to sue to enforce contractual assurances of compliance with Title VI.[14]

The defendants rely in the alternative on the Eagleton-Biden Amendment to HEW's 1978 appropriations act. The amendment essentially prevents HEW from requiring "the transportation of any student to a

House Judiciary Committee hardly compels the defendants' inference that the committee and Congress intended to prohibit government suits to enforce Title VI contractual assurances. Although the purpose of the revision is unclear, it seems highly unlikely that it would have been meant to have such an effect. It also seems unlikely that it would have been understood by Congress to have such an effect. As for (2) and (3), as explained above, the fact that Congress intended to authorize a number of means of obtaining compliance with Title VI other than contract enforcement actions cannot be said to indicate that Congress intended to prohibit such actions as a means of obtaining compliance. This is especially so given the permissive language of the Act. *Compare, e. g.,* Age Discrimination Act of 1975, § 305, 42 U.S.C. § 6104(e) ("provisions of this section shall be the *exclusive* remedy for the enforcement of the provisions of this chapter") (emphasis added) [amended 1978].

13. 45 C.F.R. § 80.8(a) provides:
§ 80.8 *Procedure for effecting compliance.*
(a) *General.* If there appears to be a failure or threatened failure to comply with this regulation, and if the noncompliance or threatened noncompliance cannot be corrected by informal means, compliance with this part may be effected by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law. Such other means may include, but are not limited to, (1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking, and (2) any applicable proceeding under State or local law.
*See also* 28 C.F.R. § 50.3 (Department of Justice guidelines for the enforcement of Title VI) (promulgated 1966): "Possibilities of judicial enforcement include (1) a suit to obtain specific enforcement of assurances. . . ." *See generally* Comment, The Courts, HEW and Southern School Desegregation, 77 Yale L.J. 321, 330–31 (1967).
As a contemporaneous construction of a statute by an agency charged with its execution, regulations such as those issued by HEW here are traditionally considered strong evidence of Congress' understanding. *See, e. g., United States v. Sheffield Board of Commissioners,* 435 U.S. 110, 131, 98 S.Ct. 965, 979, 55 L.Ed.2d 148 (1978); *Red Lion Broadcasting Co. v. Federal Communications Commission,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). On this point, see also *Lee v. Macon County Board of Education,* 270 F.Supp. 859, 862 (M.D.Ala.1967).

14. Apparently no court other than the district court here has held that the Civil Rights Act prohibits government suits to enforce Title VI contractual assurances. A number of courts have, to the contrary, held or indicated that such suits are proper. In this regard, see, for example, *United States v. Tatum Independent School District,* 306 F.Supp. 285, 288 (E.D.Tex. 1969) and *United States v. Frazer,* 297 F.Supp. 319 (M.D.Ala.1968). *Accord Brown v. Califano,* 627 F.2d 1221 at 1232, n.67 (D.C.Cir., decided Jan. 31, 1980).
In *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court recognized the existence of a private right of action under Title VI even though the Act nowhere made express provision for such a right. 441 U.S. at 703, 99 S.Ct. at 1961. In *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), a case relied on by the *Cannon* Court for support, the Supreme Court had assumed the existence of a private right of action under Title VI and entertained a suit by students in the San Francisco school system seeking to enforce contractual assurances made be school system officials to HEW that they would comply with Title VI. 414 U.S. at 568–69. In *Cannon,* Justice White, joined by Justice Blackmun, dissented from the Court's conclusion that private parties enjoy an implied right of action under Title VI, but he noted that:
To be sure, Congress contemplated that there would be litigation brought to enforce Title VI. The "other means" provisions of § 602 includes agency suits to enforce contractual antidiscrimination provisions . . .
441 U.S. at 722 & n.9, 99 S.Ct. at 1970.
*See generally Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 204, 88 S.Ct. 379, 387, 19 L.Ed.2d 407 (1967) ("We do not believe that Congress intended to withhold from the Government a remedy that ensures the full effectiveness of the Act.").

school other than the school nearest the student's home." [15] According to the defendants, the amendment also nullifies the Attorney General's right to sue to enforce contractual assurances of nondiscrimination in the operation of public schools where, as here, the relief sought involves the transportation of students to schools other than those nearest their homes.[16]

A review of the amendment and its legislative history suggests no such interpretation. Nothing in the language of the amendment precludes the United States from seeking transportation relief in a federal court suit to enforce contractual assurances of nondiscriminatory school operation. Nor is any such limitation indicated by the amendment's legislative history. What the legislative history establishes is simply that Congress intended to prevent the HEW bureaucracy from acting solely on its own authority in *administrative* proceedings to coerce local school districts into adopting busing plans.[17] Congress fully intended that the federal courts would retain their authority to mandate busing, and that they would be able to do so in response to suits such as this one brought by the United States, on referral from HEW, to enforce a school district's Title VI contractual assurances of nondiscrimination.[18]

■ The contrary interpretation of the amendment suggested by the defendants prohibits only administratively-imposed busing. Senator Eagleton explained that:

> All we are talking about is a unilateral, in-house, bureaucratic, HEW administrative order which orders busing, because they force them to. If they do not bus, they take away all of their Federal funds, impact aid, title I, just name it. "We take it away." 123 Cong.Rec. 21262 (1977). *See id.* at 21242–43; 21246. Senator Biden emphasized that:

> We are only talking here about administrative busing. We are not talking about court-ordered busing. . . .

> Look, let us try to get three things straight here. No. 1, those of you who are going to vote [against the amendment] are making one decision: That you think, absent a court order, a bureaucrat downtown or out in the district can make a judgment that there is a constitutional violation that exists. I say to you that the only person who should be able to make that decision is a duly constituted Federal court. It is not for some bureaucrat to say, "We think you violated the Constitution; therefore, we make the judgment that unless you comply with our order, you do not get any Federal money."
*Id.* at 21252. *See also id.* at 21258 (remarks of Sen. Roth) ("The purpose of this amendment is to keep the bureaucrats out of busing.").

15. The full text of the amendment is as follows:
    None of the funds contained in this Act shall be used to require, directly or indirectly, the transportation of any student to a school other than the school which is nearest the student's home, except for a student requiring special education, in order to comply with Title VI of the Civil Rights Act of 1964. For the purposes of this section an indirect requirement of transportation of students includes the transportation of students to carry out a plan involving the reorganization of the grade structure of schools, the pairing of schools, or the clustering of schools, or any combination of grade restructuring, pairing or clustering. The prohibition described in this section does not include the establishment of magnet schools.
    § 208(b), Pub.L.No.95–205, *codified at* 42 U.S.C. § 2000d.

16. HEW referred the Marion County school district case to the Department of Justice after determining that: "A complete remedy of the District's violation of the Fourteenth Amendment and of Title VI cannot be provided without transportation of some students to a school other than the one closest to their home." Letter from David Tatel, Director, HEW Office for Civil Rights, to Drew S. Days, Ass't Attorney General, Civil Rights Division, Department of Justice at 2, *attached to* Complaint. The government has maintained on appeal that "effective desegregation . . . will undoubtedly require the use of one or more of the restricted desegregation remedies."

17. There are no committee or conference reports describing the intended operation of the amendment. The floor statements of the amendment's sponsors are, however, sufficiently clear. Both Senator Eagleton and Senator Biden left no question but that the amendment

18. For example, in the course of the floor debate, Senator Eagleton stated that under the amendment,
    when HEW determines that compliance with Title VI requires that students be bused, because of the grave consequences to a community that very often accompany such a requirement enforcement may not proceed through the administrative process. HEW is authorized under Title VI to refer matters to the Department of Justice for litigation; this is the course that should be pursued if there

would call into question not the authority of the United States to bring this suit, but rather the constitutionality of the Eagleton-Biden Amendment itself.[19] The United States, in seeking to enforce the defendants' contractual assurances of compliance with Title VI, is simply seeking to enforce the Constitution.[20] It is well established that the United States is constitutionally prohibited from providing financial assistance to school districts engaged in discrimination violative of the Constitution. *See, e. g., Norwood v. Harrison,* 413 U.S. 455, 467, 93 S.Ct. 2804, 2811, 37 L.Ed.2d 723 (1973); *Cooper v. Aaron,* 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1958); *Bolling v. Sharpe,* 347 U.S. 497, 499–500, 74 S.Ct. 693, 694–95, 98 L.Ed. 884 (1954).[21] By leaving

is a decision to go forward in a case to which the [Eagleton-Biden] amendment applies.
123 Cong.Rec. 21246 (1977). *See also id.* at 21242–43; 21252; 21258; 21262.

The Eagleton-Biden Amendment aside, the defendants contend that the government's suit, because it seeks transportation relief, is likewise barred by the Equal Educational Opportunities Act of 1974. This contention, like the defendants' Eagleton-Biden argument, ignores the clear intent of Congress. The Equal Educational Opportunities Act does provide that:

No court, department, or agency of the United States shall, pursuant to section 1713 of this title [listing priority of remedies for "a denial of equal educational opportunity or a denial of the equal protection of the laws"], order the implementation of a plan that would require the transportation of any student to a school other than the school closest or next closest to his place of residence which provides the appropriate grade level and type of education for such student.

§ 215(a), 20 U.S.C. § 1714(a). However, the act also provides that:

the provisions of this chapter are not intended to modify or diminish the authority of the courts of the United States to enforce fully the fifth and fourteenth amendments to the Constitution of the United States.

§ 203(b), 20 U.S.C. § 1702(b). As Congress and the courts have understood, the United States, in asking courts to compel defendants to perform contractual assurances of compliance with Title VI, is simply asking courts to enforce the requirements of the Fifth and Fourteenth Amendments. Title VI's standard is that of the Constitution. *See* note 20, *infra.*

It may be noted that, like the Eagleton-Biden Amendment, the Equal Educational Opportunities Act's 'anti-busing' provision, otherwise known as the Esch Amendment, does serve as a constraint on extrajudicial administrative agency action. However, the Esch Amendment has been effectively superseded by the less generous Eagleton-Biden Amendment. *Compare* 20 U.S.C. § 1714(a) (Esch Amendment) (permits transportation to "closest or next closest school") *with* 42 U.S.C. § 2000d (Eagleton-Biden Amendment) (with certain exceptions, permits transportation only to "school which is nearest the student's home").

**19.** *Cf. United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973) (task of Court is "not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations"); *Lynch v. Overholser,* 369 U.S. 705, 711, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962).

**20.** There is no question but that Congress understood that Title VI's standard is that of the Constitution. For example, Senator Humphrey stated during the congressional debates:

As I have said, the bill has a simple purpose. That purpose is to give fellow citizens—Negroes—the same rights and opportunities that white people take for granted. This is no more than what was preached by the prophets, and by Christ Himself. It is no more than what the Constitution guarantees.

110 Cong.Rec. 6553 (1964). *See also id.* at 7057, 13333 (remarks of Sen. Ribicoff); 7057 (remarks of Sen. Pastore); 5606–7 (remarks of Sen. Javits); 5253, 5863–64, 13442 (remarks of Sen. Humphrey). *Accord University of California Regents v. Bakke,* 438 U.S. 265, 284–87, 2745–47, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.); *id.* at 328–55, 98 S.Ct. at 2768–2782 (opinion of Brennan, White, Marshall & Blackmun, JJ.); *United States v. Jefferson County Board of Education,* 372 F.2d 836, 848 (5th Cir. 1966), *aff'd en banc,* 380 F.2d 385, *cert. denied,* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); *Lee v. Macon County Board of Education,* 270 F.Supp. 859, 865 (M.D.Ala.1967).

**21.** As the Northern District of Illinois explained in *United States v. Chicago,* 395 F.Supp. 329 (N.D.Ill.), *aff'd mem.,* 525 F.2d 695 (7th Cir. 1975):

Where recipients of federal funds have engaged in unlawful discrimination, courts have been quick to require that federal agencies refrain from participating in the discriminatory practices, and exercise affirmative duties to police compliance and prevent constitutionally and statutorily proscribed discrimination.

395 F.Supp. at 342–43 (citing cases).

the United States with no means to challenge the discriminatory practices of the defendants, as alleged here, and no choice other than to continue funding those practices, the district court decision would force the United States to so violate the Constitution.[22] The facial constitutionality of the Eagleton-Biden Amendment was recently challenged on this general theory, viz., that the amendment impermissibly burdens the government's constitutional obligation to assure that schools receiving federal support do not discriminate. *See Brown v. Califano*, 455 F.Supp. 837, 842–43 (D.D.C. 1978). The United States Court of Appeals for the District of Columbia Circuit affirmed the district court decision rejecting the challenge, holding that even though the amendment curtails HEW's ability to terminate funding to discriminatory school programs, it leaves intact a number of other means by which the government may be able to effectively ensure that the discriminatory practices in those programs are enjoined. *Brown v. Califano*, 627 F.2d 1221,

(D.C.Cir. 1980). As the District of Columbia Circuit correctly held, one such means is a suit by the United States to enforce contractual nondiscrimination assurances such as the suit filed by the United States here. At 1232 & n.67.[23]

The United States' contract rights aside, it has also been suggested that the United States is entitled to seek the relief requested here (1) because it enjoys an implied right of action under Title VI. *see, e. g., Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 204, 88 S.Ct. 379, 387, 19 L.Ed.2d 407 (1967) (implying a right of action to the United States under the Rivers and Harbors Act of 1899),[24] and (2) because it has inherent authority to sue to enforce the Fourteenth Amendment, *see, e. g., United States v. City of Jackson*, 318 F.2d 1, 14 (5th Cir. 1963) *and* Judge Brown's dissenting opinion in *United States v. Mississippi*, 229 F.Supp. 925, 975–76 (S.D.Miss. 1964). [The majority position from which Judge Brown dissented was later reversed on appeal by the Supreme Court. *See Unit-*

---

**22.** According to the district court, when the United States seeks to eliminate discrimination in the operation of federally funded schools, in cases such as this one in which it considers it necessary to transport students to schools other than those nearest their homes, the United States' options are limited to (1) informal administrative efforts to achieve compliance with Title VI, (2) Title IV lawsuits in response to private complaints, and (3) Title IX interventions in pending private suits. *See* notes 7, 9 & 10, *supra.* Here the government has alleged (1) that, as the parties have stipulated, all necessary efforts at achieving voluntary compliance have failed and that negotiations are at an impasse, (2) that it lacks the written complaint from a parent of an affected student necessary to a government action under Title IV, and (3) that there is no pending private action in which it may intervene under Title IX.

**23.** In addition to contract enforcement actions, the *Brown* court also identified two of the potential means noted by the district court (encouragement of voluntary compliance, and suits under Title IV in response to private complaints), neither of which is available here, *see* note 22, *supra*, and two remedies created by Congress in the Equal Educational Opportunities Act of 1974. *See* 20 U.S.C. § 1709 (Attorney General may intervene in suits brought by individuals denied "equal educational opportunities" as defined in the Act); 20 U.S.C. § 1706 (Attorney General may institute civil actions on

behalf of individuals denied "equal educational opportunities" as defined in the Act).

It is uncertain whether the Equal Educational Opportunities Act remedies are available to the United States in cases such as this one. The *Brown* court did not discuss the interpretative questions these remedies have engendered. According to the government, "[t]he Attorney General under 20 U.S.C. 1706 may bring suit on behalf of an individual denied an 'equal educational opportunity,' but the relief available, particularly as relates to transportation of students, may be somewhat limited." *See e. g., United States v. School District*, 577 F.2d 1339, 1343–46 (6th Cir. 1978) (actions by Attorney General under Equal Educational Opportunities Act may not include Fourteenth Amendment claims). *See also United States v. Hinds County School Board*, 560 F.2d 619, 623–24 (5th Cir. 1977).

**24.** *See generally* Note on the Implication of Rights of Action by the United States, Hart & Wechsler's The Federal Courts and The Federal System 1301–09 (2d ed. 1973); Note, Nonstatutory Executive Authority to Bring Suit, 85 Harv.L.Rev. 1566, 1567–68 (1972) (citing cases in which Supreme Court has upheld "right of the Attorney General to institute actions in the name of the United States in order to effectuate a congressionally established scheme").

*ed States v. Mississippi*, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965).][25] Because of our understanding of the enforceability of the United States' contract rights, we find it unnecessary to pass on the question of the capacity of the United States to sue on these alternative grounds. *See, e. g., United States v. City of Jackson*, 320 F.2d 870, 872–73 (5th Cir. 1963) (on petition for rehearing) (Ainsworth, J., concurring).

■ The defendants' additional arguments notwithstanding,[26] we conclude that the United States is entitled to sue to enforce contractual assurances of compliance with Title VI's prohibition against discrimination in the operation of federally-funded schools, and that the United States is entitled to whatever relief is necessary to enforce such assurances, including "transportation relief." The decision of the district court to dismiss the United States' complaint was error. The case is

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

## APPENDIX

### ASSURANCE OF COMPLIANCE WITH THE DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE REGULATION UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

<u>Marion County District #42 (Fla.) School System</u>   (hereinafter called the "Applicant")
(Name of Applicant)

HEREBY AGREES THAT it will comply with title VI of the Civil Rights Act of 1964 (P.L. 88–352) and all requirements imposed by or pursuant to the Regulation of the Department of Health, Education, and Welfare (45 CFR Part 80) issued pursuant to that title, to the end that, in accordance with title VI of that Act and the Regulation, no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to-discrimination under any program or activity for which the Applicant receives Federal financial assistance from the Department; and HEREBY GIVES ASSUR-

**25.** *Cf. Sanitary District of Chicago v. United States*, 266 U.S. 405, 425, 45 S.Ct. 176, 178, 69 L.Ed. 352 (1925) (United States entitled to sue to remove obstruction to interstate commerce); *United States v. U.S. Klans*, 194 F.Supp. 897, 902 (M.D.Ala.1961) (same). *See generally New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *In re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895). In *Debs*, the Supreme Court stated that:

> Every government, entrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other.

158 U.S. at 584, 15 S.Ct. at 906. *See* Notes cited in note 24, *supra*; Note, Protecting the Public Interest: Nonstatutory Suits by the United States, 89 Yale L.J. 118 (1979).

**26.** In support of their position the defendants advance a number of additional arguments based on the wording or changes in wording of the National Health Planning and Resources Development Act of 1974 and the Revenue Sharing Act of 1972. For example, the Revenue Sharing Act originally provided that, when the Secretary of the Treasury was unable to achieve voluntary compliance with the Act's antidiscrimination provisions, the Secretary was authorized:

> (1) to refer the matter to the Attorney General with a recommendation that an appropriate civil action be instituted; (2) to exercise the powers and functions provided by Title VI of the Civil Rights Act of 1964; or (3) to take such other action as may be provided by law.

31 U.S.C. § 1242(b) (1972). According to the defendants, "this was an unmistakable indication of congressional understanding" that Title VI was not to be enforced by government suits to enforce contractual assurances or by other government civil actions. We cannot agree. These additional arguments of the defendants have no merit.

APPENDIX—Continued

ANCE THAT it will immediately take any measures necessary to effectuate this agreement.

If any real property or structure thereon is provided or improved with the aid of Federal financial assistance extended to the Applicant by the Department, this assurance shall obligate the Applicant, or in the case or any transfer of such property, any transferee, for the period during which the real property or structure is used for a purpose for which the Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits. If any personal property is so provided, this assurance shall obligate the Applicant for the period during which it retains ownership or possession of the property. In all other cases, this assurance shall obligate the Applicant for the period during which the Federal financial assistance is extended to it by the Department.

THIS ASSURANCE is given in consideration of and for the purpose of obtaining any and all Federal grants, loans, contracts, property, discounts or other Federal financial assistance extended after the date hereof to the Applicant by the Department, including installment payments after such date on account of applications for Federal financial assistance which were approved before such date. The Applicant recognizes and agrees that such Federal financial assistance will be extended in reliance on the representations and agreements made in this assurance, and that the United States shall have the right to seek judicial enforcement of this assurance. This assurance is binding on the Applicant, its successors, transferees, and assignees, and the person or persons whose signatures appear below are authorized to sign this assurance on behalf of the Applicant.

Dated ____October 14, 1970____

Marion County District
____#42 (Fla.) School System____
(Applicant)
By /s/ John F. Lane
(President, Chairman of Board, or comparable authorized official)

____P.O. Box 670____

JOHN F. LANE, Chairman
Marion County District School Board

____Ocala, Florida 32670____
(Applicant's mailing address)