**C.V. by and through his next friends, Michael and Johnette Wahlquist, et al., Plaintiffs,**

v.

**Elizabeth DUDEK, in her official capacity as Secretary of the Agency for Health Care Administration, et al., Defendants.**

**United States of America, Plaintiff,**

v.

**State of Florida, Defendant.**

**CASE NO. 12-60460-CIV-ZLOCH**

United States District Court, S.D. Florida.

Signed September 20, 2016

Matthew Wilson Dietz, Law Offices of Matthew W. Dietz, Miami, Florida, Edward J. Grunewald, Tallahassee, Florida, Paolo G. Annino, Tallahassee, Florida, for Plaintiffs, A.G., C.M., C.V., M.D., T.H.

George N. Meros, Jr., Andy Bardos, Allison G. Mawhinney, James Timothy Moore, Jr., Ashley Hoffman Lukis, GrayRobinson,

P.A., Tallahassee, Florida, for All Defendants (State of Florida, Secretary Dudek, Surgeon General Philip, and Director Pasley).

Stuart F. Williams, Leslei G. Street, Andrew T. Sheeran, Tallahassee, Florida, for Defendant, Secretary Dudek.

J. Patrick Reynolds, Tallahassee, Florida, for Defendants, Surgeon General Philip and Director Pasley.

Travis W. England, Elizabeth McDonald, H. Justin Park, Victoria Thomas, Lindsey Weinstock, Beth A. Esposito, Washington, D.C., Veronica Harrell-James, Assistant United States Attorney, Miami, Florida, for Plaintiff, the United States.

## FINAL ORDER OF DISMISSAL AS TO THE UNITED STATES OF AMERICA

WILLIAM J. ZLOCH, United States District Judge

THIS MATTER is before the Court sua sponte. The Court has carefully reviewed the entire court file and is otherwise fully advised in the premises.

Through its Medicaid program, the State of Florida administers and funds various services for children who are considered medically complex or fragile. Under Title II of the Americans With Disabilities Act of 1990 ("Title II"), 42 U.S.C. § 12131, et seq., each of those children is a "qualified individual with a disability." 42 U.S.C. § 12131(2) (2014). The State of Florida is a "public entity," subject to Title II's non-discrimination provision. 42 U.S.C. § 12131(1). That provision provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. Congress instructed the Attorney General to promulgate regulations that implement Title II, including this nondiscrimination provision. 42 U.S.C. § 12134(a). The Attorney General thus issued what is commonly referred to as the "integration regulation," which requires: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (2015). The Supreme Court has interpreted this regulation, in conjunction with two others,[1] to require that states "provide community based treatment for persons with mental disabilities when such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodate d, taking into account the resources available to the State and the needs of others with mental disabilities." Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 607, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999).

The United States Department of Justice ("the Department") brought this suit against the State of Florida ("the State"), alleging that the State administers its Medicaid program in a way that discriminates against the medically complex or fragile children who are eligible for services under the program. In particular, the Department's Complaint (DE 1, Case No. 13–61576–CIV–ZLOCH)[2] claims that by

---

**1.** See 28 C.F.R. pt. 35, App. A., p. 450 (defining the "most integrated setting appropriate to the needs of qualified individuals with disabilities" as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible"); 28 C.F.R. § 35.130(b)(7) (requiring public entities to "make reasonable modifications" to avoid "discrimination on the basis of disability," unless such modifications would "fundamentally alter the nature of the service, program, or activity.")

**2.** By prior Order (DE 215), this Court consolidated the Department's case, United States v.

limiting the availability of community-based services, the State has caused some medically complex or fragile children to be unnecessarily segregated in nursing facilities and placed others at risk of being unnecessarily segregated in such facilities. The Department's Complaint (DE 1, Case No. 13–61576–CIV–ZLOCH) asserts only one claim: violation of Title II of the Americans With Disabilities Act. In this posture, the Court is confronted with a single, dispositive question of law: whether Title II confers standing on the Attorney General (and hence the Department) to sue.[3] Consistent with the plain language of the Americans With Disabilities Act, the Court finds that the Department does not have standing to sue under Title II.

I.

A.

■ The Supreme Court has made clear that "when an agency in its governmental capacity is meant to have standing, Congress says so." Director, Office of Workers' Comp. Programs. Dep't of Lab. v. Newport News Shipbuilding and Dry Dock Co., 514 U.S. 122, 129, 115 S.Ct. 1278, 131 L.Ed.2d 160 (1995)("Newport News")(emphasis in original). Title II's enforcement section provides certain "remedies, procedures, and rights ... to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."

42 U.S.C. § 12133 (emphasis added). Laid beside the enforcement provisions of Titles I and III of the Americans With Disabilities Act, it is clear that Title II does not confer standing on the Attorney General and that the Department is not a "person alleging discrimination."[4]

■ The Americans With Disabilities Act ("ADA") sets forth various prohibitions against disability-discrimination. As a whole, Congress's stated intent was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). However, to achieve this end, Congress subdivided the ADA into three titles, each with distinct rights and remedial measures. Title I prohibits disability-discrimination in employment. See 42 U.S.C. §§ 12111-12117. Title II governs the administration of public services provided by governmental entities. See 42 U.S.C. §§ 12131-12165. And Title III proscribes disability-discrimination in public accommodations provided by private entities. See 42 U.S.C. §§ 12181-12189.

■ Unlike Title II, whose enforcement provision speaks only of "person[s] alleging discrimination," Titles I and III of the ADA expressly confer standing upon the Attorney General to initiate litigation. Title I provides that "[t]he powers, remedies

---

Florida, Case No. 13–61576–CIV–ZLOCH, with a substantially similar action brought by private plaintiffs, C.V. v. Dudek, Case No. 12–60460–CIV–ZLOCH.

**3.** The Court notes that although it has raised this issue sua sponte, the Parties have had a full and fair opportunity to set forth their respective positions. See DE 28, Case No. 13–61576–CIV–ZLOCH; DE Nos. 226 & 230, Case No. 12–60460–CIV–ZLOCH. The Court is, of course, not bound by any ruling of any judge who previously presided over this case. See 18B Wright, Miller, & Cooper, Federal Practice & Procedure: Jurisdiction., § 4478

(2d. ed. 2016) ("it is clear that all federal courts retain power to reconsider if they wish").

**4.** For ease of exposition, the Court uses the terms Attorney General and the Department interchangeably. Cf. 28 U.S.C. § 506 ("The Attorney General is the head of the Department of Justice"); 28 U.S.C. § 516 ("the conduct of litigation in which the United States, an agency, or officer thereof is a party ... is reserved to officers of the Department of Justice, under the direction of the Attorney General").

and procedures set forth in [Title VII of the Civil Rights Act of 1964] shall be the powers, remedies, and procedures this subchapter provides to the [Equal Employment Opportunity] Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter . . . concerning employment." 42 U.S.C. § 12117(a). In turn, Title VII of the Civil Rights Act of 1964 authorizes the Attorney General to seek various forms of judicial relief. See 42 U.S.C. § 2000e–5(f) ("the Attorney General [ ] may bring a civil action against such respondent in the appropriate United States district court"); 42 U.S.C. § 2000e–6(a) ("the Attorney General may bring a civil action in the appropriate district court of the United States"); 42 U.S.C. § 2000e–8(c) ("If any person required to comply with the provisions of this subsection fails or refuses to do so, the [appropriate] United States district court . . . shall, upon application of . . . the Attorney General . . . have jurisdiction to issue to such person an order requiring him to comply"). Title III of the ADA grants "the Attorney General [authority to] commence a civil action in any appropriate United States district court," if she has reasonable cause to believe that "(i) any person or group of persons is engaged in a pattern or practice of discrimination under this subchapter; or (ii) any person or group of persons has been discriminated against and such discrimination raises an issue of general public importance." 42 U.S.C. § 12188(b)(1)(B).

■ Where Congress has conferred standing on a particular actor in one section of a statutory scheme, but not in another, its silence must be read to preclude standing. E.g., Marshall v. Gibson's Prod., Inc. of Plano, 584 F.2d 668, 672–

676 (5th Cir.1978)[5]; see In re Griffith, 206 F.3d 1389, 1394 (11th Cir.2000) (en banc)("where Congress knows how to say something but chooses not to, its silence is controlling"). Newport News controls. There, the Supreme Court held that the Director of the Office of Workers' Compensation ("the Director") lacked standing to pursue an appeal of the decision of an administrative review board in federal court. Newport News, 514 U.S. at 136, 115 S.Ct. 1278. Central to the Court's reasoning was the absence of a provision conferring standing upon the agency head to prosecute appeals, when such a provision was found in two similar statutes. While the Longshore and Harbor Workers Compensation Act ("LHWCA") solely authorized "any person adversely affected or aggrieved by a final order of the Board" to seek review in the appropriate court of appeals, 33 U.S.C. § 921(c), the Occupational Safety and Health Act of 1970 contained a "virtually identical" appeal provision, plus a provision granting the Secretary of Labor authority to appeal. Id. at 130, 115 S.Ct. 1278. Likewise, the Black Lung Benefits Act of 1973 contained a provision notably absent from the LHWCA: one making the Secretary of Labor "a party in any proceeding relative to a claim for benefits." Id. at 135, 115 S.Ct. 1278 (quoting 30 U.S.C. § 932(k)). Faced with these measures, and noting that "[t]he withholding of agency authority is as significant as the granting of it," the Supreme Court concluded that the Director had no standing to proceed in federal court. Id. at 136, 115 S.Ct. 1278.

Congress's grant of litigation authority to the Attorney-General in Titles I and III of the ADA—juxtaposed against its omis-

---

**5.** In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1980.

sion in Title II—compels the same result. As in Newport News, "the normal conclusion one would derive from putting these statutes side by side is this: When, in a legislative scheme of this sort, Congress wants the [Attorney General] to have standing, it says so." Id. at 135, 115 S.Ct. 1278. And as in Newport News, the absence of Congress's "say so" precludes the Department from suing under Title II.

The Department deigns Newport News to be little more than a quirk of administrative law. Any fair reading of the case refutes this contention—for Newport News dealt not with the intricacies of administrative procedure, but the critical bridge between administrative proceedings and the judiciary: standing. Were there any doubt, the Supreme Court cited two provisions of Title VII of the Civil Rights Act of 1964 expressly authorizing civil litigation by agencies to explain why the Director lacked standing. Id. at 130, 115 S.Ct. 1278. Notably, the very provisions cited by the Newport News Court are the civil enforcement remedies incorporated into Title I of the ADA. See id. (citing 42 U.S.C. §§ 2000e–5(f) & 2000e–4(g)). Newport News does not govern administrative appeals as such, but rather an agency's standing to proceed in federal court.

■ It is also apparent that the Department is not a "person alleging discrimination." 42 U.S.C. § 12133. There is a "long-standing interpretive presumption that 'person' does not include the sovereign." Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 780, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). This principle is not limited merely to the regulatory sweep of a statute, but extends also to those provisions defining the actors who may be plaintiffs under the statute, those who have standing. Compare id. at 787–88, 120 S.Ct. 1858 (finding that a state is not a "person" subject to liability under the False Claims Act) with United States

v. Cooper Corp., 312 U.S. 600, 606, 61 S.Ct. 742, 85 L.Ed. 1071 (1941)(holding that the United States is not a "person" authorized to bring an action under the Sherman Act). Thus, except upon an affirmative showing of statutory intent to the contrary, " 'person' does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it." Int'l Primate Prot. League v. Admin, of Tulane Educ. Fund, 500 U.S. 72, 82–83, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991). No such showing can be made under the ADA. Title I of the ADA extends remedial authority, including authority to commence civil suit, to "the [Equal Employment Opportunity] Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability." 42 U.S.C. § 12117(a). Title II grants remedial authority only to "person[s] alleging discrimination." 42 U.S.C. § 12133. The implication is clear: if the Attorney General is not a "person" under Title I, she is not a "person" under Title II either.

The Department posits that "whether the Attorney General is a person under the statute is simply beside the point," and that the Congressional judgment that Title II's remedies shall be "provide[d] to any person alleging discrimination" does not mean that those remedies are provided only to those persons. DE 226 at 23–24. To the contrary: the language Congress chose means precisely that, and who is a person under the statute is precisely the point. Persons alleging discrimination are not, as the Department suggests, merely intended beneficiaries of the statute. Qualified individuals with a disability are the intended beneficiaries; private parties alleging discrimination are the mechanism by which Title II's substantive guarantees are enforced. The Court is not free to ignore the statutory text in the manner the Department suggests.

Three well-established principles of interpretation further support the Court's reading of the ADA. First is the "normal rule of statutory interpretation that identical words used in different parts of the same act are intended to have the same meaning." Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (quoting Department of Revenue of Ore. v. ACF Indus., Inc., 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994)); see also Mohasco Corp. v. Silver, 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980) ("we cannot accept respondent's position without unreasonably giving the word 'filed' two different meanings in the same section of the statute"). Next is the surplusage canon, the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." Kungys v. United States, 485 U.S. 759, 778, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988); see also Aspley v. Murphy, 52 F. 570, 574 (5th Cir.1892)(stating that courts must "lean in favor of a construction which will render every word operative rather than one which may make some idle and nugatory"). If the Attorney General were a "person alleging discrimination" under Title II, then reference to her in Title I would be redundant. Or the term "person" would have different meanings in Titles I and II. Nonsense. In both Title I and Title II of the ADA, the Attorney General is not a "person alleging discrimination."

Lastly, the negative implication canon, or expressio unius, supports this construction. That is, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." Alexander v. Sandoval, 532 U.S. 275, 290, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). By authorizing suits by individuals, Congress intended to bar administrative agencies, like the Department, from enforcement by litigation.

**B.**

The structure of Title II's remedial scheme similarly reveals no authority for the Department to commence civil litigation. That remedial scheme incorporates remedies available under § 505 of the Rehabilitation Act of 1973 ("§ 505"), 29 U.S.C. § 794a, and makes them available to "any person alleging discrimination" under Title II. 42 U.S.C. § 12133; see Olmstead, 527 U.S. at 590, 119 S.Ct. 2176. Section 504 of the Rehabilitation Act, which § 505 enforces, prohibits disability-discrimination by federally funded programs or activities. See 29 U.S.C. § 794(a) (2014). Section 505 provides that "[t]he remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 ... shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance. ..." 29 U.S.C. § 794a(a)(2). Ultimately, Title VI of the Civil Rights Act of 1964 ("Title VI"), which prohibits race-discrimination by federally funded programs or activities, provides:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance. ... Compliance with any requirement adopted pursuant to this section may be affected (1) by the termination of or refusal to grant or to continue assistance under such program or activi-

ty to any recipient ... or (2) by any other means authorized by law. ...'' 42 U.S.C. § 2000d–1.

The State argues that no statutory cause of action for Attorney General enforcement exists under Title VI, and therefore none exists under Title II. The State observes that, similar to the ADA's structure, Titles II, III, IV, and VII of the Civil Rights Act of 1964 expressly authorize suit by the Attorney General, but Title VI does not.[6] Title VI instead allows enforcement of conditions attached to federal funding by "any other means authorized by law"— a phrase that naturally points to extrinsic sources of enforcement authority. Hence, according to the State, suits by the Attorney General for Title VI violations are typically actions for breach of contract. See Guardians Ass'n v. Civil Serv. Comm'n of N.Y.C., 463 U.S. 582, 630 n. 24, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) ("the Federal Government can always sue any recipient who fails to comply with the terms of the grant agreement"); Cannon v. Univ. of Chi., 441 U.S. 677, 772, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (White, J., dissenting) ("The 'other means' provisions of [Title VI] include agency suits to en-

force contractual antidiscrimination provisions"); United States v. Marion Cnty. Sch. Dist., 625 F.2d 607, 609–11 & 617 (5th Cir.1980) ("we conclude that the United States is entitled to sue to enforce contractual assurances of compliance with Title VI's prohibition against discrimination in the operation of federally funded schools"); see also Arthur R. Block, Enforcement Of Title VI Compliance Agreement By Third Party Beneficiaries, 18 Harv. C.R.C.L. L. Rev. 1, 9 n.24 (1983) (noting that the Department has enforced Title VI "under two legal authorizations": suits under Title IV of the Civil Rights Act of 1964 and actions for "specific performance of contractual assurances of non-discrimination made by fund recipients").[7] Because Title II is not tied to federal funding, any cause of action for breach of a contract or covenant running with that funding was not carried over to Title II.

Although the State's logic is availing, there is a simpler explanation: Congress did not incorporate all "remedies, procedures, and rights" available under Title VI—it incorporated only those "remedies, procedures, and rights" that may be exercised by a "person alleging discrimination."

---

**6.** Compare 42 U.S.C. §§ 2000a–5 (Title II), 2000b (Title III), 2000c–6 (Title IV), 2000e–5(f) & 2000e–6 (Title VII) with 42 U.S.C. § 2000d–1 (Title VI).

**7.** The Department disagrees and suggests that, in the absence of a contractual assurance, its enforcement authority derives directly from Title VI. Cf. Barnes v. Gorman, 536 U.S. 181, 189 n. 3, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002) ("We do not imply, for example, that suits under Spending Clause legislation are suits in contract"). Whether the "other means" provision authorizes suit directly under Title VI, or merely authorizes suit for breach of contract or violations of other titles of the Civil Rights Act of 1964, appears to be a question of first impression. Indeed, the former Fifth Circuit expressly avoided the issue in Marion County, 625 F.2d at 617. Resolution of this issue was perhaps

unnecessary in the context of Title VI because the guarantees of Title VI would be coextensive with the terms and conditions of a Title VI funding grant. However, as Justice Stevens presciently observed in his concurrence in Barnes, there is a marked disconnect between Title II, which was enacted pursuant to § 5 of the Fourteenth Amendment, and § 505 and Title VI, which were enacted pursuant to the Spending Clause. See Barnes, 536 U.S. at 192, 122 S.Ct. 2097 (stating that Spending Clause cases "say[ ] nothing about the remedy that might be appropriate for [ ] a breach" of Title II). The Court need not resolve that issue in this case, however, because any enforcement rights the Department may have under Title VI, whether in contract or by statute, were not incorporated into Title II. Title II only "provides" remedial authority "to" private parties who allege discrimination. 42 U.S.C. § 12133.

42 U.S.C. § 12133. The Department rightly concedes that Title II, by its nature, incorporates less than the full panoply of Title VI procedures and remedies.[8] For example, the power to terminate federal funding under Title VI has no foothold in Title II. See 42 U.S.C. § 2000d–1. It is also beyond dispute that Title VI, the Rehabilitation Act, and Title II each authorize suit by private individuals. The Supreme Court has consistently held that Title VI allows private individuals to sue for both injunctive relief and damages. See Cannon, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (embracing the existence of a private right of action under Title VI); Franklin v. Gwinnett Cty. Pub. Sch., 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (finding that § 2000d–7 of Title VI, which abrogates states' sovereign immunity, validates Cannon's holding); Alexander, 532 U.S. at 280, 121 S.Ct. 1511. Title II borrows that private right of action from § 505, which in turn incorporates it from Title VI. See Barnes v. Gorman, 536 U.S. 181, 186, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002) ("Rehabilitation Act [remedies] are coextensive with the remedies available in a private cause of action brought under Title VI"); Olmstead, 527 U.S. at 591 n. 5, 119 S.Ct. 2176 ("a person alleging discrimination on the basis of disability in violation of Title II may seek to enforce its provisions by commencing a private lawsuit"). Among the remedies, procedures, and rights available under Title VI and § 505, this private right of action is the only such procedure that could be "provide[d] to" a "person alleging discrimination." 42 U.S.C. § 12133.

Moreover, the ADA's structure as a whole supports the conclusion that Title II incorporates only enforcement rights that may be exercised by private parties. Again, Title I of the ADA incorporates "powers, remedies, and procedures" available under Title VII of the Civil Rights Act of 1964. Cognizant that Title VII of the Civil Rights Act of 1964 bestows specific rights on private parties, the Equal Employment Opportunity Commission, and the Attorney General, Congress was careful to ensure that Title I of the ADA conferred those rights on "the Commission, the Attorney General, [and] any person alleging discrimination" by name. 42 U.S.C. § 12117(a). In Title III of the ADA, Congress incorporated certain "remedies and procedures" from Title II of the Civil Rights Act of 1964 and provided them to "any person who is being subjected to discrimination on the basis of disability. ..." 42 U.S.C. 12188(a). 42 U.S.C. § 2000a–3(a), which Title III incorporates, only allows the Attorney General to intervene in litigation at the court's discretion. 42 U.S.C. § 2000a–3(a). Title III of the ADA expands on that limited authority in a section titled "Enforcement by Attorney General," which details an investigatory obligation and an authorization to commence civil suit. 42 U.S.C. § 1218 8(b). As does Title I, Title III deliberately sets forth the who and how of its remedial scheme.

**8.** The Supreme Court has, in passing, mentioned that Title II's remedies are "the same as" those in § 505. Barnes, 536 U.S. at 189 n. 3, 122 S.Ct. 2097. However, Barnes holds only that, having incorporated a private right of action from Title VI, Title II's private right of action would provide the same remedies as Title VI's (i.e., no punitive damages). Id. at 185, 122 S.Ct. 2097. Whether Title II has in fact incorporated "a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive." Davis v. Passman, 442 U.S. 228, 239, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). The Barnes Court did not venture to say that the administrative procedures and causes of action arising under Title VI are coextensive with those available under Title II. Nor could it have.

In light of the judicious manner in which Title I and III are crafted, Title II's failure to name the Attorney General or her rights under Title VI can hardly be seen as an after-thought. And the decision to limit enforcement of Title II to suits by private parties can hardly be seen as surprising. Title II reaches into many areas traditionally regulated by states. It thereby imposes significant federalism costs, subjecting state-run public services to federal judicial review. See Olmstead, 527 U.S. at 610, 119 S.Ct. 2176 (Kennedy, J., concurring)("This danger is in addition to the federalism costs inherent in referring state decisions regarding the administration and treatment programs and the allocation of resources to the reviewing authority of the federal courts."); id. at 624, 119 S.Ct. 2176 (Thomas, J., dissenting)("the Majority's approach imposes significant federalism costs, directing States how to make decisions about the delivery of public services."). The language employed in Title II avoids compounding those federalism costs by requiring that such judicial review be at the behest of the recipients of those public services, not the federal government.

## II.

### A.

Cognizant that Title II grants it no explicit authority to commence civil litigation, the Department contends that Title II contains an embedded grant of enforcement authority. According to the Department, three aspects of Title II reveal this implied right of action.

The Department first contends that § 12134(b) of Title II "expressly adopted the Rehabilitation Act's detailed enforce-ment procedures and remedies, including the authority for the Department of Justice to seek remedies through litigation." DE 226, at 15. Section 12134(b) does nothing of the sort. That section directs the Attorney General to promulgate regulations that implement Title II, with an instruction that they be "consistent with" the Department of Health, Education, and Welfare's regulations that implement the Rehabilitation Act. 42 U.S.C. § 12134(b). This consistency mandate "does not incorporate the Rehabilitation Act's regulations into the ADA or direct the Attorney General to promulgate identical regulations for Title II." Elwell v. Okla. ex rel. Bd. of Regents of Univ. of Okla., 693 F.3d 1303, 1313 (10th Cir.2012). "It simply says that the Attorney General's regulations must be 'consistent'—that is, compatible or not contradictory—with those under the Rehabilitation Act." Id.; see also Zimmerman v. Or. Dep't of Justice, 170 F.3d 1169, 1179 (9th Cir.1999) ("42 U.S.C. § 12134(b) does not suggest that Congress intended to incorporate any provisions from the Rehabilitation Act into Title II."). Section 12134(a) authorizes the Attorney General to define the substantive standards for discrimination under Title II. Because Title II extends the Rehabilitation Act's prohibition against disability-discrimination beyond federal funding recipients to all public entities, the consistency mandate merely ensures that Title II's substantive standards are analogous to those under the Rehabilitation Act.[9] Section 12134(b) has nothing to say about the Rehabilitation Act's procedures or remedies, and it certainly does not go so far as to adopt them.

Next, the Department argues that the ADA's attorney's fee provision, which al-

---

**9.** For entities subject to both the Rehabilitation Act and Title II, this consistency mandate is particularly apropos. It prevents these entities from being subjected to conflicting sets of standards. Cf. Elwell, 693 F.3d at 1313 ("Ob-viously, Congress sought in § 12134(b) to prevent the Attorney General and the EEOC from whipsawing employers with contradictory rules in areas where their regulatory authority overlaps").

lows a court to award attorney's fees to a prevailing party "other than the United States," indicates that it may bring suit under Title II. 42 U.S.C. § 12205. The Department's argument overlooks a critical aspect of that provision, which appears in the "Miscellaneous Provisions" subchapter applicable to Titles I, II, and III of the ADA. Specifically, § 12205 allows prevailing-party attorney's fees "[i]n any action or administrative proceeding commenced pursuant to this chapter. . . ." Id. As this Order has explained exhaustively, Titles I and III of the ADA contain explicit authority for the Attorney General to bring suit. Hence, the fact that the United States is not allowed attorney's fees if it prevails in an action under Title I or III of the ADA lends no credence to the Department's argument that it may sue to enforce Title II.

Lastly, the Department asserts that absurd results will follow if this implied right of action to enforce Title II is not recognized. When this argument is unpacked, however, it becomes apparent that the Department's premonitions are entirely misplaced. The Department first complains that "without recourse to judicial remedies, the federal government would have no effective ability to bring about compliance. . . ." DE 226 at 16. That statement is question-begging at its purest; it simply assumes the answer to the issue presented: whether the federal government is the proper party to effect compliance with Title II. The Department continues that if it is not able to sue to enforce Title II, the public entities subject to it will have free reign to disregard its commands. Not so. Like many other civil rights statutes, Title II employs the concept of a "private attorney general"—private parties, empowered by a fee-shifting provision, are entitled to

effect compliance through litigation.[10] See, Fox v. Vice, 563 U.S. 826, 833, 131 S.Ct. 2205, 180 L.Ed.2d 45 (2011)("When a plaintiff succeeds in remedying a civil rights violation, we have stated, he serves 'as a private attorney general, vindicating a policy that Congress considered of the highest priority" and "[h]e therefore 'should ordinarily recover an attorney's fee' from the defendant"). The decision whether to utilize private enforcement or public enforcement lies with Congress alone, for it is the proper body to weigh the benefits and burdens associated with each regime. As the State keenly observes, "there is nothing absurd in the supposition that Congress might elect to withhold from a federal agency a boundless discretion to sue state and local governments." DE 230 at 15.

As it turns out, the Department's concern that it will not be able to commence litigation is at most a half-truth. The Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, et seq., ("CRIPA") authorizes the Attorney General to bring suit whenever she has reasonable cause to believe that persons residing in an institution have been deprived of "any of the rights, privileges, or immunities secured and protected by the Constitution or laws of the United States. . . ." 42 U.S.C. § 1997a(a). CRIPA handcuffs that authority, however, by requiring that the conditions resulting in such deprivation be "egregious or flagrant," that such deprivation be part of a "pattern or practice," and that the institutionalized persons have "suffered grievous harm." Id. The Attorney General herself must "personally sign any complaint filed pursuant to" CRIPA. 42 U.S.C. § 1997a(c). One of the ADA's core concerns is the

---

**10.** As this Court has endeavored to make clear, Title II incorporates from Title VI only those rights that may be exercised by a private party. That is, Title VI's private right of action. For that reason, the Court's construction does not render superfluous Title II's incorporation (through § 505) of Title VI remedies, as the Department contends.

treatment of disabled persons confined in institutions. See 42 U.S.C. §§ 12101(a)(2), (3), & (5); Olmstead, 527 U.S. at 589 n. 1, 119 S.Ct. 2176. Not surprisingly, then, the Department has used CRIPA as a vehicle to assert Title II violations in the past. E.g., United States v. Arkansas, Case No. 09–00033–CIV–HOLMES (E.D.Ark.2009). Recognizing the authority the Department seeks in this case would, in effect, allow an end-run around CRIPA's stringent requirements.

▇▇▇▇ The final absurd result the Department expounds is an inability to fulfill the ADA's statement of purpose. One purpose of the ADA is "to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities." 42 U.S.C. § 12101(b)(3). Without access to a litigation remedy, the Department contends that this general statement of purpose will ring hollow. Of course, a statute's purpose may not be used to "add features that will achieve the statutory 'purpose' more effectively." Newport News, 514 U.S. at 136, 115 S.Ct. 1278. Moreover, "[e]very statute proposes, not only to achieve certain ends, but also to achieve them by particular means. . . ." Id. In Titles I and III of the ADA, those means include litigation by the Attorney General. Title II does not elect that option. Instead, the Attorney General was empowered to set the substantive standards that define disability-discrimination under Title II. See 42 U.S.C. § 12134(a). Few roles could be more central to a statute's enforcement. Apparently malcontent with that duty, the Department demands not only to draw up the plays, but to carry the ball as well. Newport News aptly resolves the matter: "The withholding of agency authority is as significant as the granting of it, and we have no right to play favorites between the two." Newport News, 514 U.S. at 136, 115 S.Ct. 1278; cf. Alexander, 532 U.S. at 287, 121 S.Ct. 1511 ("Raising

up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals."); Cannon, 441 U.S. at 730, 99 S.Ct. 1946 (Powell, J., dissenting)(noting that requests for implied causes of action are an "invitation to federal courts to legislate causes of action not authorized by Congress," which "cannot be squared with the doctrine of separation of powers.").

### B.

▇▇▇▇ Without explaining why it applies here, the Department asks the Court to apply the Chevron framework to its understanding of Title II. Under Chevron. "[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Court must first determine "whether Congress has directly spoken to the precise question at issue. If the intent is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842–43, 104 S.Ct. 2778. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. 2778.

Title II grants the Attorney General rulemaking authority to implement the statute's commands. See 42 U.S.C. § 12134(a). Pursuant to that authority, the Attorney General has issued substantive regulations, e.g., 28 C.F.R. § 35.130(d), as well as one that allows designated agencies to refer complaints of noncompliance to the Attorney General "with a recommendation for appropriate action." 28 C.F.R. § 35.174. The Department seeks deference

to its belief that "appropriate action" includes resort to Department-initiated litigation. The fatal defect in the Department's plea for Chevron deference is its failure to distinguish between two distinct concepts: the scope of an agency's authority and the scope of a court's jurisdiction.

Courts must defer "to an agency's interpretation of a statutory ambiguity that concerns the scope of the agency's statutory authority." City of Arlington v. FCC, 569 U.S. ——, 133 S.Ct. 1863, 1868, 185 L.Ed.2d 941 (2013). For example, if the Federal Communications Commission decided that its authority to regulate the rents that utility-pole owners charge for cable-television pole-attachments extended to attachments that provide both television and internet, that decision would respect the agency's own authority. See id. at 1870 (citing National Cable & Telecomm. Ass'n, Inc. v. Gulf Power Co., 534 U.S. 327, 122 S.Ct. 782, 151 L.Ed.2d 794 (2002)). Chevron undoubtedly applies in that area. Id. However, courts owe no deference to the agency's understanding of the court's jurisdiction. Cases concerning standing, like Newport News, and the normal rules of construction govern here. Whether Title II confers standing on the Department is plainly an inquiry that falls within this latter category.

It bears mentioning at this juncture that "[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." Alexander, 532 U.S. at 291, 121 S.Ct. 1511 ("it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself."). Put

differently, administrative agencies may not confer standing on private plaintiffs by regulation. Nor may they confer standing on themselves. An administrative agency's entitlement to seek judicial relief must come from the statute itself. Newport News, 514 U.S. at 136, 115 S.Ct. 1278; Marshall, 584 F.2d at 676 ("the district courts [have] jurisdiction over cases brought by agencies only when 'expressly authorized to sue by Act of Congress.'"). The judicial task is to determine whether the statute confers standing on the plaintiff (and therefore jurisdiction on the court), not to defer to an agency's position on the matter. Indeed, the Department's request for Chevron deference, if credited, would achieve precisely what Alexander prohibits: using silence or ambiguity to create what Congress has not. Chevron does not apply.[11]

The Court notes that even if Chevron deference were appropriate in this case, it would do little to assist the Department. As section I of this Order shows, the ADA is neither silent nor ambiguous as to the Department's litigation authority. Title I and III provide for it in clear terms, while Title II provides otherwise, choosing instead to give remedial authority to individuals alleging discrimination. In place of that straightforward reading, the Department puts forth an exotic construction to arrive at the following conclusion: "The question of who is authorized to take action to ensure that the statutes' remedies, procedures, and rights are available in practice to victims of discrimination is a question that is not answered by the language of the statutes." DE 226 at 24. As to the suggestion that "person[s] alleging discrimination" are the ones entitled to take action, the Department responds that the meaning of the word "person" is simply not important to a proper understanding of

---

**11.** It is for this reason that the Court departs from Judge Rosenbaum's Order On Motion

For Judgment On The Pleadings (DE 40, Case No. 13–61576–CIV–ZLOCH).

Title II. See DE 226 at 23. Even if it were, the Department posits, it does not mean that Title II's remedies are provided only to those persons. See DE 226 at 24. That is not a form of reasoning with which the Court is familiar (indeed it appears to be the opposite of the expressio unius cannon). On Title II's failure to mention the Attorney General in the "Enforcement" section, the Department argues that its authority under Title II is "coextensive with the general public, such that no distinction is necessary." DE 226 at 21. Titles I and III on the other hand do mention the Attorney General because she has different rights and responsibilities than private parties under those titles. See DE 226 at 22. There is no reason to assume that Congress would be so deliberate in Titles I and III (setting forth not only the "what," but also "to whom"), yet so reckless in Title II (delineating only the "what"). Chevron requires courts to defer to permissible statutory constructions, not ingenious academic exercises in the conceivable. What the Department has suggested is of the latter ilk.

### C.

The Department's remaining arguments fare no better. Each directs the Court's attention to a purported source of authority outside the statute. Of course, the Department's cause of action, if any, must come from Title II itself. Newport News, 514 U.S. at 136, 115 S.Ct. 1278; Marshall,

584 F.2d at 676. Even so, the sources on which the Department relies do not withstand scrutiny.

The Department argues that Executive Order 13217, which directs the Attorney General to "fully enforce Title II of the ADA," supports its authority to bring suit. Exec. Order No. 13217, 66 Fed. Reg. 33,-155 (June 18, 2001). The circular nature of this argument should be readily apparent (the Executive Branch has authority to enforce Title II through litigation because the Executive Branch says it has authority to enforce Title II through litigation). Moreover, Executive Order 13217 refers to cooperative efforts with states and alternative dispute resolution, not litigation. See id.

Next, the Department points to a committee report from the House of Representatives that dealt with a previous draft of Title II's enforcement section. Whatever limited use some courts may find in such legislative history, it certainly cannot be used to override the unambiguous terms Congress chose to enact—particularly where, as here, the legislative history cited concerns language Congress rejected. See, e.g., Harris v. Garner, 216 F.3d 970, 977 (11th Cir.2000)("When the import of the words Congress has used is clear, as it is here, we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language.").[12]

---

**12.** The Court echoes the sentiments of Justice Antonin Scalia regarding this fictitious hunt for the collective intentions of the Congressional body:

> A reliance on legislative history also assumes that the legislature even had a view on the matter at issue. This is pure fantasy. In the ordinary case, most legislators could not possibly have focused on the narrow point before the court. The few who did undoubtedly had varying views. There is no reason to believe, in other words, that a "legislative intent" ever existed.

> Even if legislative intent did exist, there would be little reason to think it might be found in the sources that the courts consult. Floor statements may well have been (and in modern times very probably were) delivered to an almost-empty chamber—or even inserted into the Congressional Record as a virtually invisible "extension of remarks" after adjournment. Even if the chamber was full, there is no assurance that everyone present listened, much less agreed. As for committee reports, they are drafted by committee staff and are not voted on (and rarely even read) by the committee members,

The Department's last redoubt is what it contends to be a "substantial history of federal enforcement. ..." DE 226 at 9.[13] In support, the Department cites several district court opinions for the proposition that Title II authorizes it to participate in litigation. Most are not on point, and the remainder are not persuasive. In two of the cases the Department cites, the parties never raised, and the court never considered, the issue of the Department's standing. See United States v. N. Ill. Special Recreation Ass'n, Case No. 12–CV–07613 (N.D.Ill. Apr. 11, 2013); United States v. City of Balt., Case No. 09–CV–01049 (D.Md. Feb. 29, 2012). Four others concern the Department's intervention in existing litigation. See Lane v. Brown, Case No. 12–CV–138 (D.Or. May 22, 2013); Steward v. Perry, Case No. 10–CV–01025 (W.D.Tex. Sept. 20, 2012); Lynn E. v. Lynch, Case No. 12–CV–53 (D.N.H. Apr. 4, 2012); Disability Advocates, Inc. v. Paterson, Case No. 03–CV–03209 (E.D.N.Y. Nov. 23, 2009). In Lynn E., all parties assented to the Department's intervention; in Paterson, no party opposed it; and in Lane and Steward, no party opposed the Department's intervention on the ground that the Department lacked standing. Thus, none of these cases furthers the Department's position because none actually addressed its standing.

The Court is not persuaded by the three cases that do concern the Department's standing under Title II. In United States

much less by the full house. And there is little reason to believe that members of the committee reporting the bill hold views representative of the full chamber. Quite the contrary, the conventional wisdom is that the Committee on Agriculture, for example, will be dominated by representatives from farming states. (While some political scientists have challenged that view, it is at least clear that the representativeness of committees is unproved.) Statements in committee hearings are so far removed from what the full house possibly could have had in mind that their asserted relevance is comical. And all these doings of the houses of a bicameral legislature could not possibly have entered into the thinking of the other house—or of the President who signed the bill. The stark reality is that the only thing that one can say for sure was agreed to by both houses and the President (on signing the bill) is the text of the statute. The rest is legal fiction.

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 376 (2012). Committee reports are not a useful aid in discerning the meaning of statutory language. However, because the Court has been dragged into this morass anyway, it will make some passing observations. The Committee on Education and Labor Report cited by the Department, which does contemplate Department lawsuits to enforce Title II, dealt with a prior draft of Title II's enforcement section. That prior draft made the Rehabilitation Act's

remedies available "with respect to any individual who believes that he or she is being subjected to discrimination on the basis of disability." H.R. Rep. No. 101-485-II at 98. However, the Committee on the Judiciary rejected the "with respect to" language, instead deciding that Rehabilitation Act remedies should be "provide[d] to" persons alleging discrimination. See H.R. Rep. No. 101-485-III at 52. That committee's report speaks only of a private right of action. Id. The Senate initially proposed utilizing the "with respect to" language, but receded from that position in favor of the "provides to" language. See H.R. Conf. Rep. 101-558 at ¶ 23. One might conclude that these revisions compel the result the Court has reached here. But the Court need not speculate about what interpretive changes were intended by the compromises of persons not charged with a duty to "say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch 137), 177, 2 L.Ed. 60 (1803). The text carries the day, and the exercise of sifting through these reports offers no interpretive help.

**13.** As part of this history, the Department advises that it has entered several settlement agreements and consent decrees to redress Title II violations. See DE 226 at 8. While these efforts to encourage compliance are commendable, they have nothing to do with whether the statute authorizes the Department to sue.

v. City and County of Denver, the court found that Title II authorizes suit by the Department because the phrase "other means authorized by law" found in Title VI allows the Department to sue. 927 F.Supp. 1396, 1400 (D.Colo.1996) (citing United States v. Marion Cty. Sch. Dist., 625 F.2d 607, 612 (5th Cir.1980)).[14] However, the court neither discussed the meaning of the "provides to any person alleging discrimination" language in Title II, nor analyzed Title II's enforcement section against that of Titles I and III. Smith v. City of Philadelphia follows the same pattern—looking to Title VI without conducting analysis of Title II's language and structure. 345 F.Supp.2d 482, 489–90 (E.D.Pa.2004). And United States v. Virginia, simply adopts the reasoning of City and County of Denver without any further analysis. Case No. 12–CV–00059 (E.D.Va. June 5, 2012). The Court finds that the language and structure of the ADA compel the opposite conclusion reached in these cases.

### III.

The Department's claim for relief in this case seeks to augment the manner in which the State has chosen to deliver its service system for children with disabilities. The Supreme Court has previously recognized that constitutional principles of federalism erect limits on the federal government's ability to direct state officers or to interfere with the functions of state governments. See Printz v. United States, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). In areas where Congress does possess power to alter federal-state relations, the Supreme Court has required that "if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear." Will v. Mich. Dept. of State Police, 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)(internal quotations omitted); see also United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) ("the requirement of a clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision"). Thus, when Congress has utilized its Spending Power to induce states to establish policies that it could not otherwise compel them to enact, the Supreme Court has required that conditions attached to federal funding be expressed clearly and unambiguously. See Pennhurst State Sch. and Hosp. v. Halderman, 451 U.S. 1, 17 & 24, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Similarly, when Congress seeks to abrogate states' sovereign immunity, its intention to do so must be unequivocal. See Atascadero State HOSP. v. Scanlon, 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Although these principles do not directly govern disposition of this case, they do animate the limits Congress itself has placed on statutory suits against states.

When Congress has authorized litigation by federal agencies against state and local governments, that authorization has come in clear terms and often with strict conditions. See e.g., 42 U.S.C § 1997a (CRIPA)(authorizing suit by the Attorney General against state-run institutions where conditions are egregious or flagrant, the harm grievous, and a pattern or practice of violations exists); 42 U.S.C. § 2000h–2 (Title IX of the Civil Rights Act of 1964)(authorizing the Attorney General to intervene in any suit seeking relief from the

---

14. The court in City and County of Denver did not consider whether this authority to sue derives from a contractual assurance or from the statute itself—a question the Marion County court expressly avoided. See supra, note 9.

denial of equal protection of the laws under the Fourteenth Amendment if she certifies that the case is of general public importance); 42 U.S.C. § 2000c–6(a) (Title IV of the Civil Rights Act of 1964)(authorizing the Attorney General to sue state-operated schools after giving notice to the school board of complaints of racial discrimination and an opportunity to adjust the conditions alleged in the complaint); 42 U.S.C. § 2000b(a) (Title III of the Civil Rights Act of 1964) (authorizing the Attorney General to sue for racial discrimination in state-owned facilities). Statutes such as these fueled the Supreme Court's observation in Newport News that "the United States Code displays throughout that when an agency in its governmental capacity is meant to have standing, Congress says so." 514 U.S. at 129, 115 S.Ct. 1278.

 Titles I and III of the ADA say that the Attorney General has standing to commence civil litigation. Title II does not. The Court's "job is to honor the [ ] statutory language. . . ." Arcia v. Fla. Ser'y of State, 772 F.3d 1335, 1347 (11th Cir.2014). That language requires the Court to conclude that the Attorney General does not have standing to assert the claim raised in this case. To hold otherwise would be for the Court to make the naked judicial claim to legislative power—a claim fundamentally at odds with our system of government—to be able to rewrite Title II in accord with the Department's textual interpretation.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** that the United States of America's Claim raised in its Complaint (DE 1, Case No. 13–61576–CIV–ZLOCH) be and the same is hereby **DISMISSED** for lack of standing to sue.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 20th day of September, 2016.